**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | | |
|---|---|---|
| **IN RE:** | * | |
| **KARA ANNE DIPIETRO** | * | **Case No. 23-13304-NVA** |
| **Debtor** | * | **(Chapter 7)** |

* * * * * * * * * * * * *

| | | |
|---|---|---|
| **STATE EMPLOYEES CREDIT UNION OF MARYLAND, INCORPORATED** | * | |
| | * | |
| **Plaintiff** | | |
| | * | |
| **v.** | | **Adversary Proceeding 23-00208** |
| | * | |
| **KARA ANNE DIPIETRO** | | |
| | * | |
| **Defendant** | | |

* * * * * * * * * * * * *

## DEBTOR'S CLOSING BRIEF

Defendant, Kara Anne DiPietro (the "Debtor" or "Ms. DiPietro"), hereby submits her closing brief for the trial held on the *Complaint to Determine Nondischargeability of Debt* [Dkt.# 1] (the "Complaint") brought by Plaintiff, State Employees Credit Union of Maryland, Incorporated (the "Plaintiff" or "SECU").

I. Introduction

The dispute here turns on whether a commercial loan that Ms. DiPietro personally guaranteed was obtained by (i) use of a *materially* false statement in writing; (ii) that was *reasonably* relied upon by SECU; and (iii) which was made by Ms. DiPietro with an *intent to deceive*. See 11 U.S.C. § 523(a)(2)(B).

While this was a business loan, SECU's claims are based on a Personal Financial Statement dated August 4, 2021 (the "First PFS") and a Personal Financial Statement dated August 5, 2022

(the "Second PFS"). SECU claims that in both the First PFS and the Second PFS Ms. DiPietro inflated the value of her assets, specifically her ownership interests in real estate described as the Landrake Property and the Ellison Property (Complaint, ¶¶ 31-40, 51-60), and understated or failed to disclose her liabilities (*Id*. ¶¶41-52, 61-64).

As the Court noted when denying SECU's summary judgment motion—

> "In *Koep*, this Court discussed and analyzed the elements required to prevail on a claim under § 523(a)(2)(B):
>
> > In order to sustain an action under Section 523(a)(2)(B) of the Bankruptcy Code, a plaintiff must show that: (1) the defendant made a written statement; (2) the written statement was about her financial condition; (3) the statement was materially false; (4) the defendant published the statement with the intent to deceive the plaintiff; and (5) the plaintiff reasonably relied on the false statement. The intent to deceive may be inferred by the totality of the circumstances, including a debtor's knowing or reckless disregard for the accuracy of financial statements. A written statement is materially false if it paints a substantially untruthful picture of the defendant's financial condition by misrepresenting information of the type that would normally affect a plaintiff's decision to grant credit. Mere inaccuracy is not sufficient, rather, material falsity requires a significant understatement of liabilities or exaggeration of assets.
> >
> > As to the reliance requirement, the standard under this section is "reasonable" rather than "justifiable." The reasonable standard is usually met by evidence that the loan would not have been extended if accurate information about the borrower's financial status had been disclosed. Several factors are considered in determining whether a plaintiff reasonably relied upon a false financial statement: (1) creditor's standard practice in evaluating whether a borrower is creditworthy; (2) standards or customs in the industry in evaluating creditworthiness, i.e., what constitutes a commercially reasonable investigation of the data supplied by a potential borrower; and (3) circumstances that exist at the time of the application for credit, i.e., whether there are any indications (or "red flags") that would alert an ordinarily prudent lender to the possibility that the data is inaccurate.
>
> *In re Koep*, 334 B.R. at 372–73 (internal citations omitted). *See also In re Matthews*, 599 B.R. 838, 862 (Bankr. D. Md. 2019) (discussing *Koep* and the types of statements that "concern" a debtor's financial condition)."

*Memorandum and Order Denying Motion for Summary Judgment* [Dkt.# 36, p. 5-6].

II. Statements Regarding Assets

Regarding SECU's allegations that Ms. DiPietro overstated her assets, the only statements regarding assets that were put at issue by the Complaint and at trial were (a) the value of the Landrake Property,[1] (b) the value of the Ellison Property,[2] and (c) the total assets value noted.

However, SECU admitted that it didn't actually care what Ms. DiPietro's assets were, or what their values were. As was explained by Rodney Reed, SECU's commercial credit manager – that is, the highest authority in the credit approval process for this loan: "The driver is the guarantee, the signature of the guarantor saying that they would repay. If you wanted the assets, then I would have taken the assets as collateral. I would have done a lien search. I would have done an appraisal. I would have actually done a mortgage to make sure that I was in a good position. In this case, I'm taking the personal guarantee of the owner who is pledging any of their personal assets to repay it. Personal guarantee is the driver, not the personal assets." (Tr.4, 69:7-14) (emphasis added).[3]

After all, the loan could have been approved even if Ms. DiPietro's net worth was

---

[1] 1836 Landrake Road, Baltimore, MD 21204

[2] 8405 Ellison Road, Lutherville-Timonium, MD 21093

[3] For reference, the citation method below is being used herein, as followed by [page #].[line(s)]:
- "Tr.1" is citing to the transcript of the first day of trial, March 13, 2205.
- "Tr.2" is citing to the transcript of the second day of trial, March 17, 2205.
- "Tr.3" is citing to the transcript of the third day of trial, June 30, 2205.
- "Tr.4" is citing to the transcript of the fourth day of trial, July 1, 2205.

negative. (Tr.4, 45:17-19). Regardless of SECU's indifference – which shows the statements were not material – Ms. DiPietro did not inflate the value of her assets.

a. The Landrake Property

Ms. DiPietro's valuations of the Landrake Property at $615,000 on the First PFS and then $725,000 on the Second PFS were duly explained by her use of "Zillow" estimates plus adding value because of significant improvements being made to the property during that period of time. (Tr.2, 30:4—32:9; and Tr.4, 102:17—104:14; *see* Exs. D14 and D15). On her subsequent bankruptcy schedules, the lower figures Ms. DiPietro used were liquidation value, as opposed to market value. (Tr.2, 51:3-13). Thus, any argument based on comparing the personal financial statements and the bankruptcy schedules is misplaced.

Even assuming arguendo that the value was misstated, SECU had little or no interest in what the value of this property was. SECU ignored the discrepancy between the real estate values on the first page and second page of each PFS. *See* Exs. P05 and P06. And, SECU did nothing to verify the value. (Tr.3, 158:10-14).

Thus, there were no materially false statements made by Ms. DiPietro in the First PFS or Second PFS as to the Landrake Property.

b. The Ellison Property

The valuations of the Ellison Property were even less of a concern for SECU. As Mr. Reed made clear, "the real estate is only material if you're taking it as collateral. At that point [of approving credit], it's just stated information." (Tr.4, 58:6-7) (emphasis added). That conclusion was highlighted by the obliviousness that SECU maintained as to the Ellison Property being co-owned Ms. DiPietro and her ex-husband, and how that

joint ownership interest would affect the value available to Ms. DiPietro. (Tr.3, 159:7-24). Clearly, the value of Ms. DiPietro's personal real estate was simply not a material statement for SECU's approval of the loan. (Tr.4, 49-1-3).

Despite the property's value not being material, much evidence was presented by SECU regarding the mortgage against the property. There is no dispute that Ms. DiPietro was not personally liable for the mortgage on the Ellison Property. *See* Ex. P13, p. 5. Despite SECU's purported concern with the mortgage and the conclusory claim of "high reliance" stated during trial, the actual insignificance of the mortgage is shown by confusion on both sides – and even within SECU's ranks – as to how the mortgage should have been detailed by Ms. DiPietro. While Ms. DiPietro noted "n/a" for the balance she owed for the Ellison Property, she also noted monthly mortgage payments of $1,500. (Ex. P05, p. 2). Without any instruction otherwise, Ms. DiPietro believed that this was how to portray the fact that she wasn't liable on the mortgage but was contributing payments toward the property. (Tr.1, 182:3-13; and 184:21—185:7). On's SECU end, Mr. Weinstein – the banker and the only one who actually communicated with Ms. DiPietro – believed there was a mortgage with a monthly payment of $1,500. (Tr.2, 139:2-3; and 190:5-8); whereas the credit analyst, Mr. McWilliams, thought there was no mortgage and, puzzlingly, that the $1,500 was being disclosed as something that used to be paid (Tr.3, 162:22—163:12).

Furthermore, despite all this purported concern with the Ellison Property being surmised after the fact at trial, depending on the different personal discretions of those within SECU's credit department, the value of the property itself could have been

discounted by either 50% or 70%. (Tr.4, 69:22—70:10). Thus, the argument that Ms. DiPietro made a materially false statement regarding the Ellison Property in the personal financial statements doesn't hold water. Rather, as the credit analyst's boss, Mr. Reed, made plain and simple: the value of the real estate was not material. (Tr.4, 49: 1-3).

c. Total Assets

Regarding the stated total value of assets of approximately $4.9 million on the First PFS and approximately $5.6 million on the Second PFS, the only significant portion of those amounts beyond real estate interests was the "other assets" line item. (Exs. P05 and P06, Page 1, Section 3). SECU conceded that those values were not material representations, as they were known to be the business value and, therefore, completely negated from consideration in the credit memo (i.e., the approval decision), in accordance with SECU's standard practice. (Tr.3, 161:6-12). Thus, the attempted comparison of the "total assets" figures to smaller figures stated on Ms. DiPietro's bankruptcy schedules, many months or over more than a year later, was misplaced. Furthermore, the discrepancy was thoroughly explained as being due to the business' intervening bankruptcy filing after failing to be paid on two large projects. (Tr.2, 48:3—50:17). Thus, there was not a materially false statement made by Ms. DiPietro in the First PFS or Second PFS as to the value of her assets.

III. Statements Regarding Liabilities

SECU's argument that Ms. DiPietro's liabilities were understated or not disclosed is also refuted by the facts. More to the crux of a nondischargeability claim, even if there were discrepancies in the liabilities stated on the personal financial statements, those liabilities were

made known to SECU long before it extended the loan. Thus, there can be no reliance.

Specifically, as to the alleged liabilities that were the focus on at trial – Newtek Small Business Finance, American Express, and taxing authorities – each was known to SECU no later than August 18, 2021 (*see* Exs. P40, D08), more than a week prior to the credit memo being finalized (Ex. P38). Thereafter, SECU went on to discuss those matters internally. *See* Ex. D10. Ms. DiPietro later supplied documents as requested, reflecting a $770,000 loan from Newtek, payment terms settlement of a $245,000 American Express lawsuit, and IRS statement showing a balance owed of more than $200,000. *See* Exs. D16, p. 12; P65, p. 7 and 4. For SECU to argue that it relied on a prior understatement or lack of disclosure regarding those liabilities is nonsense.

Moreover, those business debts would not have been considered in SECU's analysis of Ms. DiPietro's personal finance metrics, regardless of amount, because of (or despite) SECU's assumption that all business loans require personal guarantees. (Tr.4, 62:21—63:8). In further evidence that any discrepancy regarding those liabilities was of no concern to SECU, there was no request for Ms. DiPietro to update the First PFS. (Tr.2, p. 39:18-22).

The same indifference was expressed by SECU to other liabilities, even those explicitly stated on the personal financial statements. For example, there was a $140,000 difference between the mortgage balances stated on the first and second page of the First PFS. *See* Ex. P05 It's hard to conceive that SECU "relied heavily" on a statement of liability amounts if it didn't bother to check the math on its own form.

As to the tax liabilities, the disputes that Ms. DiPietro explained to SECU in August 2021 were validated by the release of those amounts 2024. *See* Exs. D18 and D19.

Accordingly, there was no materially false statement made by Ms. DiPietro in the First PFS or Second PFS as to her liabilities.

IV. Statements Regarding Income

Ms. DiPietro's income figures on the financial statements were arguably put at issue during trial, albeit having not been alleged in SECU's complaint. Nonetheless, SECU has conceded that the income figures stated on the First PFS and Second PFS were not relied upon in making the credit approval decisions. (Tr.3, 146:11—147:11; Tr.4, 59:3-20; and *see* Ex. P38, p. 5). Thus, again, any comparison of those figures to others, whether it be tax returns or bankruptcy schedules, was misplaced. Hence, there was no materially false statement made by Ms. DiPietro in the First PFS or Second PFS as to her income.

V. SECU's Lack of Reliance

Even if there were errors in the personal financial statements – which Ms. DiPietro wholly denies – SECU has failed to show any reliance. After all, the personal financial statement was just a starting point prior to underwriting efforts (Tr.3, 148:6-10), with no instruction given to Ms. DiPietro as to how to complete the form (Tr.2, 165:13-15), other than perhaps "don't overthink the exactness of it." (Tr.2, 126:2-8).

In fact, SECU expected that any concerns with material errors or omissions on the personal financial statement would be resolved and verified by other documents. (Tr.3, 162:12-21). That's because the personal financial statement was just one of many facets of the financial information that SECU obtained; and was not the ultimate driver of approval. (Tr.4, 49:12-22). Rather, the primary purpose of the personal financial statements was to authorize SECU to obtain a credit report. (Tr.2, 140:8-22; and Tr.4, 15:16-19). Regarding the alleged omissions, SECU's underwriter wasn't relying on the personal financial statement; he was going to other sources. (Tr.2, 199:23—200:2). Furthermore, despite numerous sections left blank, SECU didn't even

think that the First PFS was incomplete. (Tr.2, 196:6-14).

Thus, there was no actual reliance by SECU on the personal financial statements.

VI. SECU's Lack of Reasonable Reliance

To the extent there was any reliance, it certainly wasn't reasonable. Not only did SECU deviate from its documented lending policy, it ignored its hierarchical instructions on this loan, and seemingly extended credit without common creditor knowledge; with all that being done in the face of what SECU admits were numerous "red flags."

While, as expected, Mr. McWilliams and Mr. Reed defended themselves, the facts show that that this loan was not handled according to SECU policy and instructions. For example, despite the provision in SECU's lending policy that "Partially owned personal assets will NOT be considered as valued assets" in evaluating a personal guarantor's repayment ability, Mr. McWilliams did so. (*Cf.* Ex. D09, p. 10 [emphasis in original]; and Ex. P38, p. 6). Exceptions to the lending policy require approval of the Member Business Loan Committee. Ex. D10, p. 10. And, despite the discussion at the "Credit Meeting," which resulted in the need for an "Opinion of Counsel" letter from Ms. DiPietro's attorney to be reviewed by SECU's attorney, that never happened. *See* Ex. D10 and P38, p. 7.

Moreover, and without diminishing Mr. McWilliams' career moving up the ranks at SECU, his lack of knowledge regarding the effect of judgment liens and tax liens on real estate is clearly below standard lending knowledge, particularly when the equity in real estate is purportedly valued in the credit approval analysis. *See* Tr.3, 149:6-25. Of course, though, Mr. McWilliams' boss knew better. (Tr. 4, 55:6-9).

SECU's deviation from policy and instruction, along with substandard analysis, are only exaggerated where, as here, SECU admits there were red flags that should have heightened the

level of scrutiny and compliance. A sampling of SECU's own statements: "It is confusing as to who and how much she owes." Ex. D10. "We need clarification and elaboration about these business legal issues either from her attorney or accountant, whoever has the expertise." *Id.* "We had a lot of questions." (Tr. 2, 182:13). Despite those admitted red flags that arose from the information Ms. DiPietro provided, coupled with the internal instruction to get more information from a professional third party, the credit analyst chose to go back to the same source of the confusing information to resolve the confusion. *See* Tr.3, 145:13-21; 146:3-10; and 170:7-14.

Furthermore, it appears that Mr. McWilliams didn't even analyze the documents he was given. For example, the America Express stipulation noted settlement terms and stated that the case could be reopened to enforce those terms. Ex. P65, p. 7. Although inquiring about judgments and payment plans was SECU's practice (Tr.3, 131:10-17), Mr. McWilliams did not do so for the American Express lawsuit that was an open judgment according to public record. Ex. D10.

Simply put, there is no evidence of reasonable reliance by SECU.

VII. <u>The Second PFS – Absolutely No Reliance</u>

Mr. Reed made clear that the Second PFS was of no use in the approval of the loan extension in 2022. Rather, the loan had to be termed out because it was the only viable option. (Tr.4, 11:19—12:17; Tr.4, 26:3-15). As Mr. Reed admitted on direct examination, "not much value" was placed on the Second PFS by SECU. (Tr.4, 29:2-8). At that point, the "400,000 is already out, so it's more of how you're going to fix it." (Tr.4, 29:14-15; *see also* Tr.4, 31:21-25). As a result, Mr. Reed noted that any failure to disclose liabilities on the Second PFS wouldn't have been a deal killer. (Tr.4, 31:10-17). Thus, no reliance whatsoever has been shown regarding the Second PFS.

VIII. No Intent to Deceive

Finally, the evidence, including more than a day of testimony from Ms. DiPietro, shows that she had no intent of deceiving SECU. Mr. Weinstein – her only point of contact – even acknowledged that Ms. DiPietro was "upfront." (Tr.2, 197:11). She supplied what was asked of her. Ex. P58.

Ms. DiPietro didn't even know what parameters SECU was looking at to approve the loan. (Tr.4, 115:1-18), so she wouldn't know what effect, or how much effect, if any, that inflation of asset values or understating or failing to disclose a liability would have. At best, Ms. DiPietro was confused as to SECU's lending parameters. She told SECU that she didn't understand some of the terminology on the personal financial statement. (Tr.1, 97:1-3). She even thought that the loan was "unsecured" weeks later (Ex. P49), but that characterization also depends on who you ask at SECU, with Mr. Weinstein stating that the loan was unsecured (Tr.2, 131:11 and 152:1) and Mr. McWilliams stating the opposite (Tr.3, 48:9).

While the analysis requires a totality of the circumstances, there is no evidence that Ms. DiPietro intended to deceive SECU with the First PFS or Second PFS.

IX. Conclusion

The 523(a)(2)(B) nondischargeability elements are supported by the facts of this case. Rather, the facts show that there were not any false statements made by Ms. DiPietro (much less, one made with an intent to deceive), nor was there any reliance by SECU on the allegedly false statements. To the extent that it's a close call, the law requires narrow and strict construction in favor of dischargeability. *See Crocker v. Matthews (In re Matthews)*, 599 B.R. 838, 861 (Bankr. D. Md. 2019). Accordingly, judgment should be entered in favor of the Debtor.

Ms. DiPietro's proposed findings of fact are attached hereto.

WHEREFORE, for the foregoing reasons, Defendant and Chapter 7 Debtor, Kara Anne DePietro, respectfully requests that this Honorable Court enter judgment in her favor.

Respectfully submitted,

September 8, 2025

/s/ Joseph M. Selba

Joseph M. Selba, Bar No. 29181
Tydings & Rosenberg LLP
One East Pratt Street, Suite 903
Baltimore, Maryland 21202
(410) 752-9753
jselba@tydings.com
*Attorneys for Debtor/Defendant*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, on this 8th day of September 2025, that a copy of the foregoing *Brief* was served on the following:

Marc E. Shach, Esquire
Coon & Cole, LLC
305 W. Chesapeake Ave., Suite 510
Towson, Maryland 21204
*Plaintiff's Counsel*
**VIA ECF**

/s/ Joseph Selba
Joseph Selba