**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**at Baltimore**

| | | |
|---|---|---|
| **IN RE:** | * | |
| **KARA ANNE DIPIETRO** | * | **(Chapter 7)** |
| **Debtor.** | * | **Case No. 23-13304-NVA** |

* * * * * * * * * * * * *

| | | |
|---|---|---|
| **STATE EMPLOYEES CREDIT UNION OF MARYLAND, INCORPORATED** | * | |
| | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Adv. Proc. No. 23-00208** |
| **KARA ANNE DIPIETRO** | * | |
| **Defendant.** | * | |

* * * * * * * * * * * * *

**PLAINTIFF STATE EMPLOYEES CREDIT UNION OF MARYLAND, INCORPORATED'S POST-TRIAL BRIEF**

Pursuant to this Honorable Court's Amended Order Setting Post-Trial Briefing Schedule and Setting Hearing for Closing Arguments dated July 11, 2025, Plaintiff State Employees Credit Union of Maryland, Incorporated ("SECU" or "Plaintiff"), by and through its undersigned counsel, hereby submits this brief and further states as follows:

## Background

Defendant/Debtor Kara Anne DiPietro ("Ms. DiPietro" or "Defendant") filed a petition with this Honorable Court for relief under Subchapter V of Chapter 11 of the U.S. Bankruptcy Code on May 11, 2023. *See In re Kara Anne DiPietro*, Case No. 23-13304 (Bankr. D. Md. 2023) [ECF 1]. On March 21, 2024, this Honorable Court entered an Order converting Ms.

DiPietro's bankruptcy case to one under Chapter 7, at Defendant's request. [ECF 69]. On July 16, 2024, this Honorable Court entered an Order of Discharge in Ms. DiPietro's Chapter 7 case.

On August 17, 2023, SECU timely filed a two-count complaint for nondischargeability against Ms. DiPietro. Both counts were based on 11 U.S.C. § 523(a)(2)(B). The first count related to the personal financial statement ("PFS") that Ms. DiPietro submitted to SECU dated August 4, 2021 (the "1st PFS") in connection with the initial application for a revolving commercial line of credit on behalf of her company Holdings Management Company ("Holdings"), and the second count related to the PFS that Ms. DiPietro submitted to SECU dated August 5, 2022 (the "2nd PFS") in connection with the change-in-terms agreement for that loan. *See Compl.* (The 1st PFS and the 2nd PFS are collectively referred to herein as the "PFS'es.")

The Court conducted a four-day merit trial on March 13, March 17, June 30 and July 1, 2025, during which time the Court heard testimony from four witnesses: (1) Ms. DiPietro, who testified twice; (2) Irwin Weinstein ("Mr. Weinstein"), who, on the dates relevant to this case was employed by SECU as a Business Relationship Banker; (3) Edward McWilliams ("Mr. McWilliams"), who, on the dates relevant to this case, was employed by SECU as a Credit Analyst; and (4) Rodney Reed ("Mr. Reed"), who, on the dates relevant to this case, was employed by SECU as its Commercial Credit Manager.

**Proposed Findings of Fact**

Ms. DiPietro is and, at the times relevant to this case, was a well-educated and sophisticated businesswoman. At the time of the initial SECU Loan, she was well-experienced in commercial lending, both as the owner of multiple businesses that had applied for commercial loans (and someone who had provided commercial guaranties in connection with

at least some of those loans) but also as the owner of a business that was a lender to other small businesses.

Ms. DiPietro graduated from the University of Maryland College Park with a degree in education and human development and maintained a 4.0 grade point average[1] during her tenure, which she marketed on her resume that she had prepared. **[P62; Tr. Vol. 1, 15:12-16:19 (March 13, 2025) [2]]** Over her years in business, she was awarded various accolades, including Small Businessperson of the Year by the Small Business Administration, Women's Business Enterprise of the Year by the Washington/Maryland Minority Companies Association, Smart CEO Circle of Excellence Finalist, Bridging the Gap President's Award by the Greater Baltimore Committee, and Inc. Magazine's Top 5,000 Fastest Growing Private Companies in the Nation. **[P62; Tr. Vol. 1, 87:19-89]** She touted these honors, holding herself out as a savvy businesswoman.

Ms. DiPietro was the owner of HMC, Inc. ("HMC") and served as its Vice President from January 2013 to May 2015 and its President and Chief Executive Officer from May 2015 until November 2023. **[P62; Tr. Vol. 1, 18:11-19:16]** HMC was a design-build contractor for food service operators in locations such as hospitals or government facilities. **[*Id.* at 18:18-19:2]**

During her years of leadership with HMC, she had involvement with the company's loans and financial obligations. She testified, "I would seek out loans and financing to support

[1] When asked about her grade point average in trial, and before being confronted with her resume, she first testified, "I think it was the upper threes." **[Tr. Vol. 1, 14:1-14]** Her GPA was something she knew well. In order to have had a 4.0 GPA at the time she graduated, she must have had a 4.0 GPA during her entire college career. And she proudly displayed it on her resume. That she did not truthfully answer the question regarding her college GPA is emblematic of the pattern of misstatements that she has made in the facts underlying this case.

[2] For brevity, citations to the trial transcript include the date of the transcript only in the first citation herein.

the business operation," and further testified that she filled out loan applications for the company and submitted them to lenders. **[*Id.* at 19:22-20:22]**

She testified there were at least four such loans **[*Id.* at 21:9]**, which included a $1 million line of credit and $700,000 term loan, both with Newtek Small Business Finance, LLC ("Newtek") **[*Id.* at 21:10-25]**, as well as materials financing with Billd Exchange LLC ("Billd") that "might have been a million dollar limit, but I can't say for sure." **[*Id.* at 45:1-2]** She was the point of contact on those loans, including in the application process and the underwriting process. **[Tr. Vol. 1, 20:23-21:2]** HMC also incurred debt to Johnson-Lancaster and Associates, Inc. ("Johnson-Lancaster"), which filed suit in the U.S. District Court for the District of Maryland against HMC on April 17, 2020, and obtained a judgment against HMC on July 19, 2021 in the principal amount of $622,960.71, plus pre-judgment and post-judgment interest and costs (the "2021 Johnson-Lancaster Judgment"). **[P67]**

Prior to applying for the Loan from SECU, Ms. DiPietro founded and ran Kinetic Capital, LLC ("Kinetic Capital"), which she testified was a lender that made loans to two or three small businesses before the business ended when the COVID-19 pandemic began in the year 2020. **[P62; Tr. Vol. 1 27:22-29:16]** She owned and ran the company, which was made up of "just a couple of people." **[Tr. Vol. 1 28:12-21]**

Beginning in 2019 (prior to applying for the SECU Loan), Ms. DiPietro founded and was the President and Chief Executive Officer of Kinetic Capital Community Foundation, Inc. (the "Kinetic Foundation"). **[P62; Tr. 35:17-38:19]** When asked about it, Ms. DiPietro initially testified that the Kinetic Foundation existed to "do a lot of grassroots things," including to "provide meals, … help people coming out of prison to kind of get connected with services," and do "Thanksgiving giveaways." **[*Id.* at 36:9-19]** However, her resume primarily touted the Kinetic Foundation as a "non-profit dedicated to community land trusts and the development

of urban ecosystems." **[P62]** When asked about that description from her resume, she testified that the Kinetic Foundation had submitted a proposal to the City of Baltimore to receive a grant of land "to develop … so that it could be a place where people worked, that we could have community banks there, you know, for financing purposes." **[Tr. Vol. 1, 37:4-38:7]**

Ms. DiPietro testified that she founded Holdings Management Company ("Holdings") at the end of the year 2019.[3] She served as its President and Chief Executive Officer for the entire existence of the company until it filed for bankruptcy in 2023. **[P62; Tr. Vol. 1, 40:17-41:1]** She also was the sole owner of the company. **[*Id.* at 41:4-7]** Holdings was a millworking subcontractor for the fit-out of commercial properties. **[*Id.* at 41:8-15]** Holdings and HMC overlapped in various respects, including that the dates of their operation overlapped and they shared workspace. **[*Id.* at 41:16-25]**

Ms. DiPietro testified that Holdings took on debt as a company, including "[m]aterials financing, equipment financing, AR [accounts receivable] financing … mobilization financing, a line of credit, a term loan." **[*Id.* at 42:1-15]** Those creditors included SECU, Sandy Spring Bank, Billd, Levelset, Capital One, Howard County Economic Development Authority, Mobilization Financing **[*Id.* at 43:19-24, 58:23-10, 60:8-11, 70:3-13]** She signed the lease with Prologis for Holdings' new property in Savage, Maryland, but she testified that she "can't remember" if she personally guaranteed it. **[*Id.* at 42:16-43:12]** Similarly, she testified that she did not recall if she provided a personal guaranty to Mobilization Financing **[*Id.*at 71:13-16]**, did not believe that there was a personal guaranty on the Capital One financing and did not remember if there was a personal guaranty on the Levelset or Billd obligations **[*Id.* at 45:3-10]**

---

[3] As further indicia of her propensity to mislead others in connection with her businesses, Ms. DiPietro's resume represented that her affiliation with Holdings began in "MAY 2015." **[P62 (emphasis in original)]** When confronted about this inconsistency, Ms. DiPietro explained, "The company was incorporated in 2019, but the *planning* for it started earlier" and then tried to walk back her earlier testimony that she had authored the resume (P62). **[Tr. Vol. 1, 39:23-40:16 (emphasis added); *id.* at 15:12-22 ("I'm sure I prepared it.")]**

However, in her individual bankruptcy Petition, she scheduled Billd as an unsecured creditor in the amount of $211,727.44, stating that she incurred the debt, that it was a "business debt," that it was not subject to offset and not checking any of the boxes for the debt being "[c]ontingent," "[u]nliquidated" or "[d]isputed." **[P07 at SECU000812]** She further testified that there were two sureties involved, including Great Midwest Insurance Company ("Great Midwest") and Aegis Security Insurance Company ("Aegis"). **[Tr. Vol. 1, 81:11-82]** Aegis was a surety for HMC and might also have been one for Holdings, while Great Midwest was just for Holdings. **[*Id.*]** She testified she did not remember if she provided a personal guaranty for either surety. **[*Id.* at 82:12-18]** However, in her Petition, she scheduled Aegis as an unsecured creditor for an "[u]nknown" amount, stating that she incurred the debt, that it was for "surety bonds," that it was not subject to offset but that it was "[c]ontingent," "[u]nliquidated" and "[d]isputed." **[P07 at SECU000811]** When confronted with that aspect of her Petition, she testified, "I think we listed anyone who may make a claim" against her personally. **[Tr. Vol. 1, 83:17-24]**

In fact, Ms. DiPietro had provided more personal guaranties than she admitted. She testified that she filed for personal bankruptcy "[b]ecause the business debt was – you know, people were filing claim[s] against me personally and coming after me personally" and that "some of them" were because of personal guaranties on business debt. **[Tr. Vol. 1., 151:14-22]** And in her meeting of creditors, she testified:

> THE [TRUSTEE][4]: Ms. DiPietro, how did you come to find yourself in a bankrupt position? Tell me what happened.
>
> MS. DIPIETRO: So, as a small business owner **I was required to personally guarantee pretty much everything from the buyer agreements to bank**

[4] The meeting of creditors transcript incorrectly identified the trustee as "THE JUDGE." At trial, the Court pointed out and SECU stipulated that references in the meeting of creditors transcript to "THE JUDGE" were typographical errors that referred to the trustee. **[Tr. Vol. 1, 153:22-154:10]**

> **financing.** And the reason for the filing is I need relief from the personal guarantees on this debt.
>
> THE [TRUSTEE]: And these are the personal guarantees that you issued for companies HMC Inc. and Holdings Management Company. Is that correct?
>
> MS. DIPIETRO: That's correct.

**[P55, 3:6-17 (emphasis added)]** She could not have "guaranteed pretty much everything," as she testified to in her meeting of creditors, and yet have guaranteed only the SECU, Sandy Spring, HCEDA and Newtek obligations, as she testified to at trial.

Ms. DiPietro testified that she was involved in all of the loan applications, credit request applications and surety applications for Holdings and that she did them, "probably with Josh [Persing][5]." **[*Id.* at 85:1-13]** She further testified that she was responsible for all of the financial documents that were requested by those various creditors or other entities as part of those various types of funding. **[*Id.* at 85:14-86:7]** She had actual knowledge of Holdings corporate debts and her individual debts.

**The Landrake Property**

On July 12, 2017, Ms. DiPietro took title to real property located at 1836 Landrake Road, Towson, Maryland 21204 (the "Landrake Property"), which she still owned on the Petition Date. **[P18]** According to the Deed, the purchase price of the Landrake Property was $460,000. **[*Id.*]** On July 12, 2017, Ms. DiPietro granted a Purchase Money Deed of Trust to Pentagon Federal C.U. in the principal amount of $414,000. **[P19]** In her Petition, she scheduled the Landrake Property as being worth $460,000 and the mortgage balance as being $373,618 as of the Petition Date. **[P07, SECU000794, 808; *see also* P25]** In other words, she represented to the Bankruptcy Court that the Landrake Property had not increased in value from the date she acquired it in 2017 until the time of her bankruptcy in 2023, implying that it

[5] Josh Persing was the Chief Financial Officer of both HMC and Holdings. **[Tr. Vol. 1, 48:11-14]**

had not increased in value when she applied for the SECU Loan in 2021 or when she entered into the SECU CTA in 2022.

**The Ellison Property**

Ms. DiPietro divorced her ex-husband Richard DiPietro ("Mr. DiPietro") in the year 2014, and they have remained divorced since then. **[Tr. Vol. 1, 178:20-25]**

On June 28, 2019, Ms. DiPietro and Mr. DiPietro took title as joint tenants to real property located at 8405 Ellison Road, Lutherville-Timonium, Maryland 21093 (the "Ellison Property") for the purchase price of $490,000. **[P08]** That same day, they granted a Purchase Money Deed of Trust for $481,124.[6] On March 25, 2020, they refinanced their mortgage and granted a new Deed of Trust on the Ellison Property for $481.786. **[P10-P11]** From the purchase of the Ellison Property through the making of the CTA, Ms. DiPietro remained personally obligated to pay the mortgage.

In her Petition, Ms. DiPietro represented to the Bankruptcy Court that the value of the Ellison Property as of the Petition Date was "[u]nknown." **[P07 at SECU000795]**.

In her meeting of creditors in her personal bankruptcy case, Ms. DiPietro testified, "I'm on the title [to the Ellison Property], but my name was to be taken off. I'm not sure why it's still on there, but I don't have an interest [in] that property." **[P55 at SECU001223, 5:8-10]** She further testified in her meeting of creditors that she was added to the title "[b]ecause I helped him to initially pay for the – a portion of the downpayment and in order to do that I requested to be on the title … There wasn't an agreement per se. But there was no equity in the home. He had to file hardship and I'm not sure where his financing situation stands with that, so I wanted to come off the title. But the paperwork I guess hasn't been filed. I'm following up with him on that." **[P55 at SECU001234-1235, 16:17-17:6]** Yet, at trial, she testified that it

[6] According to the deed of trust, Mr. DiPietro signed it on Ms. DiPietro's behalf as her attorney-in-fact. **[*Id.*]**

was not true that she was supposed to come off the title to the Ellison Property. **[Tr. Vol. 1, 182:14-17]**

She testified in her meeting of creditors that she had contributed nothing toward the Ellison Property since the initial $10,000 she contributed toward the down payment. **[P55 at SECU001238, 20:7-12]** Specifically, she testified that she did not make any mortgage payments on the property. **[*Id.*]** However, in the affidavit that she submitted to this Court in opposition to SECU's motion for summary judgment, she affirmatively represented that "the First PFS did not a monthly payment of $1,500 that I was paying towards the property," and she testified [**P61 at SECU001340, ¶ 6]**

On December 27, 2024, Ms. DiPietro and Mr. DiPietro sold the Ellison Property under a "short sale" for the price of $515,000. **[P15; Tr. Vol. 1, 196:3-25]** Ms. DiPietro testified that she did not disclose to her real estate agent, the buyers, the title company or any other third parties that the Ellison Property was encumbered by SECU's judgment lien. **[Tr. Vol. 1, 197:5-9, 199:24-200:5]** Ms. DiPietro testified that, as part of that sale process, she provided her agent, the title company, the buyers or their agent with a copy of the order of discharge from her personal bankruptcy case **[Tr. Vol. 1, 200:6-10]**, representing to them that all under-secured liens on the Ellison Property had been discharged through the bankruptcy, even though SECU's judgment lien was still valid, pending disposition of this non-dischargeability action.

**The Newtek DOT and Newtek Judgment**

On or about July 3, 2018, Ms. DiPietro granted an Indemnity Deed of Trust (the "Newtek DOT") on the Landrake Property for the benefit of Newtek in the principal amount of $770,000 that recites that she was a personal guarantor (the "Newtek Guaranty") of an HMC loan from Newtek (the "Newtek Loan"). **[P22]**

On June 2, 2021, the Circuit Court of Maryland for Baltimore County entered a confessed judgment in favor of Newtek and against Ms. DiPietro and HMC, jointly and severally, in the principal amount of $735,105.21, plus pre-judgment interest of $112,700.82 as of February 10, 2021, and thereafter at the rate of 8.25% per annum through the date of judgment, plus late fees of $7,934.55, plus a miscellaneous fee of $35.00, plus expenses of $9,972.16, for the total sum of $865.747.74 (the "Newtek Judgment" or "Newtek Lawsuit")**[P81, P83-P84, Tr. Vol. 4, 161:13-164:16]** The certified docket reflects that Ms. DiPietro filed a motion on August 3, 2021, after the entry of the confessed judgment, and the motion was denied on August 25, 2021. It further reflects that she filed a second motion on August 31, 2025, which motion was denied on September 22, 2021. **[P81]**

In her Petition, Ms. DiPietro scheduled the Newtek debt as a "[j]udgment lien from a lawsuit" and as a recorded lien in the amount of $779,365.74. **[P07 at SECU000807]**

**The AMEX Judgment**

American Express National Bank ("AMEX") filed a lawsuit against Ms. DiPietro and HMC in the Circuit Court of Maryland for Baltimore County on or about October 15, 2018 (the "AMEX Lawsuit"). **[P66 at SECU001592-1595]** On October 21, 2020, AMEX and Ms. DiPietro, through her counsel at the time, filed a Stipulation of Dismissal without Prejudice of the AMEX Lawsuit (the "AMEX Stipulation of Dismissal"), as a dismissal on stipulated terms, pursuant to Md. Rule 2-506(b). **[P66 at SECU001588]** On February 26, 2021, AMEX filed with the Circuit Court a motion to vacate the dismissal because HMC and Ms. DiPietro had not made all of the payments due under the settlement, and there remained a balance due of $244,449.09, plus cost courts. **[P66 at SECU001580-1581]** She testified that she knew at the time that AMEX filed its motion to vacate the AMEX Stipulation of Dismissal that AMEX was alleging that Ms. DiPietro and HMC were in default of the AMEX settlement for non-

payment. **[Tr. Vol. 2, 92:6-93:4]** She testified that she was represented by counsel in that case at that time, that "we were anticipating that [filing]" and "became aware of it at some point." **[Tr. Vol. 2, 93:19]** In fact, she testified that HMC and she intentionally did not pay under the AMEX settlement. **Tr. Vol. 2, 93:16-94:2]**

Ms. DiPietro's counsel filed a response to that motion to vacate the dismissal on March 11, 2021. **[P66 at SECU001568-1572]** The Circuit Court held a remote hearing on the motion on May 6, 2021, at which time the Court granted the motion to vacate dismissal and entered a judgment in favor of AMEX and against HMC and Ms. DiPietro, jointly and severally, in the principal amount of $244,449.09, plus court costs of $270 (the "AMEX Judgment"). **[P66 at SECU0011552-1560]** Ms. DiPietro testified that she attended that hearing, and she heard and saw the judge make her decision during the hearing; in other words, she had actual knowledge of the AMEX Judgment on the day it was entered **[Tr. Vol. 2, 95:10-15, 96:14-17, 97:11-15]** and testified that she remembered that the Circuit Court entered that order. **[Tr. Vol. 1, 525:7-17]**

As her counsel filed a motion to withdraw, she filed a *pro se* motion for new trial on May 7, 2021, which the Court denied on June 1, 2021 **[P66 at SECU001542, 1550]** She filed a *pro se* appeal of the AMEX Judgment on July 11, 2025 **[Tr. Vol. 1, 253:8-15]**, which was subsequently stricken by the Circuit Court pursuant to Md. Rules 20-203(e) and 20-201(g). **[P66 at SECU001537, 1540]** She was sent notice of the striking of her appeal from the Circuit Court dated June 9, 2021. **[P66 at SECU001537]** On June 22, 2021, she filed with the Circuit Court another *pro se* post-trial motion entitled, "Kara DiPietro's Motion to Vacate Judgment Against Her Individually Due to a [sic] Lack of Personal Jurisdiction, Rule 12(b) (2) [sic]," along with "Defendant's Line Regarding Powers of Ex Virtutue Officiis." **[P66 at SECU001523-1528; Tr. Vol. 1, 254:22-255:13]** On July 12, 2021, she filed a response to

AMEX's opposition to the June 22nd Motion to Vacate. **[P66 at SECU001512-1515]** The Circuit Court entered an order denying the June 22nd Motion to Vacate on July 16, 2021. **[P66 at SECU001511; Tr. Vol. 1, 255:14-23]** At trial, Ms. DiPietro testified that she did, in fact, receive that order in the mail, although "much later than 7/15, but I don't remember exactly" because, she speculated, the Court "forgot I wasn't represented or assumed I had access to the electronic system for the circuit court…." **[Tr. Vol. 2, 101:12-19]** Her testimony on that point is not credible because (a) prior court notices issued in the case, including the Court's Notice to Employ New Counsel that was issued on June 15, 2021, after her attorney's motion to withdraw was granted **[P66 at SECU001532]** and the notice striking her notice of appeal dated June 9, 2021 **[P66 at SECU001537]** reflected that they were being sent to her at her Landrake Property (not care of her former counsel), as do subsequent court notices/writs **[e.g. P66 at SECU001505]**, as well as filings from AMEX's counsel **[e.g. P66 at SECU001520]**; (b) she didn't testify to a specific date she received the order or provide any corroborating evidence of it; (c) if the Court clerk thought she was still represented and had sent it to her former attorney, he would likely have forwarded it to her; and (d) it is wholly inconsistent with her prior behavior in the case that, after filing two post-trial motions and a notice of appeal in a two-month period that she would have suddenly ceased any further effort to stay apprised of the status of her case, particularly given the stakes of the case (a $244,719.09 personal judgment). Even if the Court finds her testimony on this point as credible, she testified that when she received the order, she did not contact SECU to tell SECU that the representation she had made to Mr. Weinstein about there being a settlement with AMEX was inaccurate. **[Tr. Vol. 2, 101:20-2]** In any event, regardless of whether she had actual knowledge of the order denying her June 22nd Motion to Vacate, because she attended the May 6, 2021, hearing, she undisputedly had actual knowledge of the termination of the AMEX settlement and the entry

of the AMEX Judgment, which are material facts that she misrepresented to SECU in August 2021.

**The 2021 Johnson-Lancaster Case**

On July 12, 2021, the U.S. District Court for the District of Maryland entered the 2021 Johnson-Lancaster Judgment against HMC in the principal amount of $622,960.71. **[P67]** The Court entered a receivership order against HMC (the "Receivership Order") that same day. **[*Id.*]** On August 2, 2021, Johnson-Lancaster and the Court-appointed receiver filed a Petition for Contempt against HMC and Ms. DiPietro (the "Contempt Petition"), alleging that Ms. DiPietro did not cooperate with the receiver under Receivership Order on multiple occasions and asking the Court to find both HMC and Ms. DiPietro in contempt and impose sanctions against them in the amount of $25,000, plus attorneys' fees in the amount of $5,000. **[P69]** Although the Receivership Order was stricken on August 24, 2021, the Contempt Petition was pending at the time that Ms. DiPietro first contacted SECU to request the Loan and when she submitted the 1st PFS to SECU; in fact, it was filed one day before she initially reached out to SECU for the Loan and two days before she provided the 1st PFS to SECU. **[P67]** On August 4, 2021, the day that she submitted the 1st PFS to SECU, Holdings filed a Motion to Intervene in the federal Johnson-Lancaster case, which motion was granted on August 12, 2021. **[*Id.*]** Ms. DiPietro had actual knowledge that Holdings was actively litigating in the Johnson-Lancaster case at the time Holdings was applying for the initial SECU Loan.

**The Initial SECU Loan**

Against this backdrop, on August 3, 2021, at 6:41 p.m. – the same day that Ms. DiPietro filed a motion with the Circuit Court for Baltimore County regarding the Newtek Judgment, one day after the filing of the Contempt Petition against her in the 2021 Johnson-Lancaster Case, less than three weeks after the Circuit Court for Baltimore County denied her June 22nd

Motion to Vacate the AMEX Judgment – Ms. DiPietro made an online "Formstack Submission For: Business Inquiry" to SECU, stating she was "[l]ooking for a line of credit and term loan" for Holdings.[7] **[D07, Tr. Vol. 2, 18:8-19:23]**

Mr. Weinstein[8] received the Formstack inquiry **[Tr. Vol. 2, 114:8-17, 115:16-22]** and spoke with Ms. DiPietro the next day, August 4, 2021, sometime before 2 p.m. **[Tr. Vol. 2, 19:20-23]** At 2:01 p.m. that day, Mr. Weinstein emailed Ms. DiPietro, following up on the call and asking her to provide certain information, including a completed PFS. **[P51; Tr. Vol. 1, 102:8-22, 103:12-17]** His email attached a blank PFS. **[*Ids.*]** She filled out and signed the 1st PFS and emailed it back to Mr. Weinstein that same day at 7:37 p.m. **[P58; P05; Tr. Vol. 1, 106:8-25; Tr. Vol. 2, 134:1-7]**

**The 1st PFS**

Directly above Ms. DiPietro's signature on Page 4 of the 1st PFS appeared the following representation:

> I authorize State Employees Credit Union of Maryland, Inc. (SECU) to make inquires [sic] as necessary to verify the accuracy of the statements made and to determine my creditworthiness. Including but not limited to credit bureau inquires [sic], verification of my personal and business tax returns with the IRS, credit and banking references, etc. I hereby certify the above and the statements contained in the attachments are true and accurate as of the date hereof. The statements are made for the purpose of either obtaining a loan or guaranteeing a loan. I understand FALSE statements m[a]y result in forfeiture and possible prosecution by the Attorney General (Ref. 18 U.S.C. 1001).

**[P58; P05 (emphasis in original)]**

---

[7] Mr. Reed testified that "SECU doesn't have an application in the true sense, or as most people are familiar with, is that you have an application and you fill it out. The driver is the personal financial statement…. **[Tr. Vol. 4, 12:20-22]**

[8] Mr. Weinstein testified that, in general, no one else from SECU has contact with the applicant with respect to the actual loan application process, and with this Loan he did not recall whether anyone else had contact with Ms. DiPietro, but it was "not likely." **[Tr. Vol. 2, 145:2-14]**

Ms. DiPietro filled out her PFS'es in typeface, rather than by hand. In the 1st PFS, Ms. DiPietro represented that her total assets were worth $4,891,219 and her total liabilities were $838,250, giving her a net worth of $4,052,969. **[P05]** On the first page of her PFS, she represented that she had only $45,250 of "Debt Owed to Banks (Schedule C)," $518,000 in "Real Estate Mortgages (Schedule A)" and $25,000 of "Other Liabilities." **[P05]**

She represented that her total income, including her annual "Salary, Bonuses, Commissions," was $503,284. **[P05]** However, her 2020 federal tax return that she provided to Mr. Weinstein about one year later (August 8, 2022) reported "[w]ages, salaries, tips, etc." of $173,351 and "[o]ther income from Schedule 1, line 9" of negative-$46,806, resulting in a "total income" of $126,545. **[P40]**[9] Ms. DiPietro admitted in her testimony that the $126,545 of income she reported in her 2020 income tax return was substantially less than the $503,284 of income that she reported in the 1st PFS. **[Tr. Vol. 1, 145:19-146:5]** She also admitted that she did not report any losses in the 1st PFS. **[Tr. Vol. 1, 146:12-13]**

In the "CONTINGENT LIABILITIES" section, she answered "No" to the question, "Do you have any contingent liabilities? If so, describe." **[P05]** She then left blank the sub-questions in that section, which included, "As endorser, co. maker or guarantor," "On leases or contracts?," "Legal Claims," "Other Special Debt" and "Amount of Contested Income Tax Liens." **[P05; Tr. Vol. 1, 147:13-148:11]** She did not disclose that she had guaranteed the Newtek Loan. She did not disclose that she was a named defendant and judgment debtor in the Newtek Judgment and AMEX Judgment. She did not disclose any other personal guarantys or

---

[9] Ms. DiPietro testified that the tax return she provided to Mr. Weinstein in **P40** was not actually filed with the IRS but was filed at some later date that she could not recall. **[Tr. Vol. 1, 131:22-132:22]** She testified that she stopped trusting her accountant ("maybe we didn't trust him anymore") and fired him. **[Tr. Vol. 1, 136:17-137:3]** She also testified that she filed an amended 2020 tax return that was not included in the document she provided to Mr. Weinstein in **P40**. **[Tr. Vol. 1, 136:6-11]** She testified that she did not review the original 2020 tax return (that she provided to SECU) for accuracy before it was filed. **[Tr. Vol. 1, 141:17-19]** She further testified that "I don't recall" if any information from the first page of the Form 1040 (where the income is listed) changed from the original return to the amended return. **[Tr. Vol. 1, 142:19-7]**

contingent liability, such as to Billd or Aegis, both of whom she scheduled in her Petition. She did not disclose, as she would later testify in her meeting of creditors, that she "was required to personally guarantee pretty much everything from the buyer agreements to bank financing." **[P55, 3:6-17]**

Where asked, "Are any assets pledged other than as described on schedules? If so, describe," she wrote, "No." **[P05; Tr. Vol. 1, 148:14-16]** She did not disclose that she had pledged the Landrake Property under the Newtek DOT in connection with her Newtek Guaranty, nor did she disclose that the Newtek Judgment and AMEX Judgment were both judgment liens on her interest in both the Landrake Property and the Ellison Property.

Where asked, "Are you a defendant in any suits or legal actions?" she answered in typeface, "Yes/No." **[P05; Tr. Vol. 1, 148:17-21]** She did not disclose that she was a named defendant and judgment debtor in the AMEX Lawsuit or that she was a named defendant and judgment debtor in the Newtek Lawsuit. She further didn't disclose that Johnson-Lancaster and the receiver appointed by the U.S. District Court had filed the Contempt Petition against her that sought sanctions of $30,000 against her for allegedly violating the Receivership Order.

These omissions are even more egregious because the top of the Page 2 of the 1st PFS instructed Ms. DiPietro, "*If over $1,000, itemize in the provided Schedules or on Separate Schedules." **[P05-1]** The PFS called for Ms. DiPietro to breakout the debts and provide a greater degree of information, not to try to cram all of the information into the lines provided and not to combine the debts that were the subject of the questions. Ms. DiPietro testified that she noticed that asterisked statement when she filled out the PFS. **[Tr. Vol. 1, 171:12-15]**

In Schedule A of the 1st PFS, pertaining to real estate, she listed both the Landrake Property and the Ellison Property. **[P05]** She reported the present market value of the Landrake Property was $615,000. She testified that she derived that value at least in part from Zillow,

but the Zillow valuation that she provided in her exhibits showed that the "Zestimate" of the Landrake Property as of September 2021 was $548,900. **[D03, 175:19-23]** Another of her exhibits, the Maryland State Department of Assessment and Taxation valuation for the Landrake Property was listed as $487,400 as of January 1, 2023. In her Petition filed on May 11, 2023, she listed the value of the Landrake Property as $460,000, which is the same as the purchase price when she bought it in 2017. **[P07, SECU000794; P18]**

She admitted in her testimony that none of the values in evidence, whether the purchase price, the Zillow valuation, the SDAT valuation or her Petition value, were at $615,000 or higher. **[Tr. Vol. 1, 177:14-17]** and that none of them were even above $550,000. **[*Id.* at 177:18-20]**

Ms. DiPietro overinflated the value of the Landrake Property on her 1st PFS to benefit her in the SECU credit application, then utilized the lowest valuation figure in her bankruptcy Petition, when it would benefit her to show a lower value of that asset. For purposes of the SECU Loan, she inflated the value of the Landrake Property in the 1st PFS by at least $65,000.

Additionally, she did not disclose on the 1st PFS that she had granted the Newtek DOT for $770,000 as a lien against the Landrake Property. **[Tr. Vol. 1, 168:17-25; Tr. Vol. 1, 169:1-170:1]** And she did not disclose that the Newtek Loan was in default and Newtek had obtained a judgment against her on account of her guaranty, which, of course, would have placed the Landrake Property in jeopardy of foreclosure.

In Schedule A of the 1st PFS, Ms. DiPietro listed the Ellison Property, even though she took the position that she should have come off the title **[P05]** She valued it as $515,000 and included it in the total "Real Estate (Schedule A)" figure on Page 1 of the PFS. **[*Id.*; Tr. Vol. 1, 180:6-8]**

She reported the Ellison mortgage as having a "Balance Owed ($)" of "n/a," implying that there was no mortgage on the property and that she was not obligated on any mortgage for the property ("…because it's not my personal responsibility") **[P05; Tr. Vol. 1, 182:12-13]**, despite the fact that there was, in fact, a mortgage on the property at that time and she was a grantor of the deed of trust for it. **[P10]** (She testified that she initialed and signed the deed of trust. **[Tr. Vol. 1, 195:14-23])** Although she wrote "$1,500" in the column for "Mortgage Held by Pymt(s) per month," she left blank the row for the name of a mortgagee **[P05]** In fact, she testified at trial that the $1,500 she was paying per month were not mortgage payments. **[Tr. Vol. 1, 184:21-185:1]** She testified she was paying $1,500 a month to Mr. DiPietro (not to the mortgagee) and that it was "supposed to go towards equity in the home. … I mean, he could put it towards – it just helped him afford the house. So he – I don't know how he spent the money. … I would pay 1,500 a month that would help him with his expenses." **[Tr. Vol. 1, 185:1-12]** In other words, she did not intend for the "$1,500" notation in Schedule A of the PFS to denote to SECU that it was a mortgage payment.

In short, she represented to SECU in the 1st PFS that she had a one-half interest in the Ellison Property, when she actually took the position that she was supposed to come off the title. She represented to SECU that the Ellison Property was mortgage-fee, when, in fact, it was encumbered by a deed of trust that Ms. DiPietro herself had signed on a loan $481.786 less than a year and a half before, and which property ultimately sold at a short sale, meaning, for less than the balance of the mortgage. Therefore, she overinflated her 1st PFS by at least $256,500, which is half of the "Present Market Value ($)" of the Ellison Property that she listed therein.

In Schedule C of the 1st PFS, Ms. DiPietro was asked to list "DEBTS OWED TO FINANCIAL INSTITUTIONS (Include Credit Cards, Installment Loans & Lines of Credit)."

**[P05]** She listed five credit cards that totaled $21,520. **[*Id.*]** She did not list any other debts, including, without limitation, the AMEX Judgment, the Newtek Judgment/Guaranty/DOT, or any of the other debts that she had guaranteed.

Schedule D of the 1st PFS asked for "DEBTS AND ACCOUNTS OWED TO OTHERS (Itemize Debts over $1,000. Combine Debts under $1,000)." **[P05]** Ms. DiPietro did not disclose any such debts and left the section blank. **[*Id.*; Tr. Vol. 1, 172:18-20]**

The 1st PFS did not disclose the existence of the AMEX Judgment ($244,719.09) or the AMEX Lawsuit, nor did it disclose the existence of the Newtek Guaranty, the Newtek DOT, the Newtek Lawsuit or the Newtek Judgment ($865.747.74). Ms. DiPietro omitted at least $1,110,446.83 of debts from her 1st PFS.

Mr. Weinstein testified that his portion of SECU's commercial loan application process consisted of: (1) SECU receiving the Formstack submission; (2) Mr. Weinstein contacting the applicant and having a conversation; (3) Mr. Weinstein requesting financials from the applicant, including "[e]verything from tax returns, personal financial statements, depending on the type of loan would depend on what we request"; (4) Mr. Weinstein reviewing the financials and asking any questions that he has from his review; (5) Mr. Weinstein having another conversation with the applicant to decide if he should submit the application to the commercial credit department, "to advise the person, you know, yeah, I think it works, or no, I don't think it works…."; (6) Mr. Weinstein uploading "to a share drive where the underwriter takes it from there." **[Tr. Vol. 2, 116:20-117:13]** He further testified that while the underwriter performs the underwriting, he may send Mr. Weinstein questions, which he copied and pasted in an email to the applicant. **[Tr. Vol. 2, 117:22-118:1]** When he receives answers to those questions from the applicant, he forwards them back to the underwriter, and he "become[s] more of a middle person to move the information." **[*Id.* at 118:1-3]** He testified he's "really

not involved in the underwriting process, but I then take over, if it's approved, to head towards the closing process," which entails "doing a doc prep request and sending a DocuSign," reviewing them for accuracy and, if accurate, telling the operations department that they're approved and accurate. **[*Id.* at 118:9-20]** The operations department then sends Mr. Weinstein the loan documents to sign on behalf of SECU, and he signs them, after which they are sent to the member to sign and come back to him on an email. **[*Id.* at 118:20-22]** He then forwards the documents to the operations department, which books the loan. **[*Id.* at 118:23]** Mr. McWilliams and Mr. Reed testified similarly.

Mr. Weinstein testified that he remembered this specific Loan because it was made during the COVID-19 pandemic and, at the time, SECU wasn't receiving "what I would call a lot of loans that are interesting. We were doing a lot of PPP [CARES Act Paycheck Protection Program] work…," and he found Ms. DiPietro "interesting" and "fun" to talk with. **[Tr. Vol. 2, 119:10-120:1]** Mr. Weinstein testified that he did not meet with Ms. DiPietro in connection with the Loan because of the pandemic, that he had more than one phone call with her, but the main form of communication, "informationally speaking," he had with her was via email. **[Tr. Vol. 2, 120:9-17]** He testified that "there was a couple of phone calls, but that's mainly where she just explained what her business [did]…." **[Tr. Vol. 2, 120:18-19]** He testified that he only remembered having one phone call with Ms. DiPietro after receiving her Formstack submission and his sending the PFS form to her by email **[P51]** on August 4, 2021. **[Tr. Vol. 2, 122:24-123:3]**

Mr. Weinstein testified that at the time the Loan was made, SECU had a policy that "any loan that is done to a company that is a for[-]profit company, we require a personal guarantee. That's just we do. Anything – we require it on everything right down to our credit card, up to a commercial mortgage." **[Tr. Vol. 2, 127:17-20]**

Mr. Weinstein testified that his standard intake phone call pattern was to tell the applicant that "the person does guarantee the loan as part of the practice" **[Tr. Vol. 2, 124:5-13]** and that "it is my practice to tell people there's a personal guarantee. Otherwise we wouldn't be asking for personal tax returns"; however, he did not remember whether he told Ms. DiPietro that a personal guaranty was required in the initial phone call. **[Tr. Vol. 2, 123:22-124:4]** Stating it differently, he testified that at no point in the Loan process, either in 2021 or 2022, did he tell Ms. DiPietro that she would not need to give a personal guaranty. **[Tr. Vol. 2, 125:9-12, 126:9-12]**

Mr. Reed, who was the commercial credit manager at the time of the Loan and CTA, testified that personal guarantees are "[a]lways" required. **[Tr. Vol. 4, 14:4-7]** "Policy at SECU is that anybody that was in an owner position of 20 percent or more would be required to guarantee…." **[*Id.*]**

Mr. McWilliams testified that, at the time of the Loan, SECU had a policy regarding personal guarantees in commercial loans, which was that "Personal guarantees are required for any owner of a business who own[s] 20 percent or more of the business." **[Tr. Vol. 3, 48:23-49:3; 68:10-14]** He testified that he was not permitted to recommend approval of (or to approve, depending on its size) a loan if such a person did not provide a personal guaranty. **[Tr. Vol. 3, 49:5-12]** Such an action "would be a policy exception and require approval from a lending committee." **[*Id.*]** The lending committee was not involved in this Loan. **[Tr. Vol. 3, 50:2-4]** To the point, Mr. McWilliams testified that had Ms. DiPietro not provided SECU with a PFS, "I would not have been able to process the application if she did not eventually provide it to us, we would decline the application for incompleteness." **[Tr. Vol. 3, 68:15-19]**

Mr. Weinstein testified that, under SECU's standard practice in August 2021, "[p]ersonal financial statements are required for any loans over $100,000, which this would

have been." **[Tr. Vol. 2. 130:13-19]** He testified that he told Ms. DiPietro in the initial phone call that the PFS was something that SECU would rely on in the loan process. **[Tr. Vol. 2, 126:20-23]** He testified that "we wouldn't have gone forward without it." **[Tr. Vol. 2 132:24-133:2]** He told Ms. DiPietro in an email dated August 18, 2021, that "Yes you will be the personal guarantor…" **[P49]** and did not tell her that a personal guaranty did not matter. **[Tr. Vol. 2, 153:25-154:3]** He "wouldn't have told her that, that they [SECU] wouldn't rely on it [her PFS]." **[Tr. Vol. 2, 153:12-15]** He did not tell Ms. DiPietro that he was only requesting her PFS so he could verify her identity or only so that he could pull a credit report. **[Tr. Vol. 2, 132:9-14]** In fact, he testified that there was no other use of the PFS that SECU had besides either obtaining a loan or guaranteeing a loan. **[Tr. Vol. 2, 140:5-7]**

Mr. Reed testified that the PFS "has a disclosure that indicates that all the financial information is true to the best of the knowledge of the signer … it gives you a – kind of a character representation of the borrower." **[Tr. Vol. 4, 15:16-23]** Mr. Reed testified that the character of the borrower and guarantor was "important in any lending." **[Tr. Vol. 4, 16:4]**

Mr. Weinstein testified that he generally asks for the PFS to be "filled out completely" and that there may be "small inaccuracies" if, for example, the applicant made a payment on a credit card after filling out the PFS that was not reflected in the balance stated in the PFS. He did not think that he would have told Ms. DiPietro that she didn't have to spend too long on the PFS because "it's not a long involved document." **[Tr. Vol. 2, 126:2-6]**.

Although he did not remember what he did here, Mr. Weinstein testified that he generally looks over a submitted PFS "for completion" and looks at the listed debts, then he uploads it to the share drive. **[Tr. Vol. 2, 135:8-17]** Mr. Weinstein uploading it to the share drive "generally means that I feel comfortable enough to move forward and send it to the underwriter." **[Tr. Vol. 2, 137:11-16]** Mr. Weinstein testified, "I rely on the PFS as somebody

telling me the truth in general. … any time I get a PFS, that's all I have to work with" **[Tr. Vol. 2, 141:9-15]**, and "I have to completely rely on it. I have no other source." **[Tr. Vol. 2, 140:23-141:3]** He testified that the certification of accuracy that Ms. DiPietro provided at the bottom of the PFS was "important" because "…I can't pull credit. So I can't verify anything, other debts or anything other than what she – that she discloses. … So I use this – this is all I have to work from is what is declared." **[Tr. Vol. 2, 140:8-22]** Specifically with this Loan, he testified that he had to completely rely on the truthfulness of the statements that Ms. DiPietro made in the 1st PFS because "It's the only document I get. It's the only thing I can rely on." **[Tr. Vol. 2, 141:4-8]**

Mr. Weinstein testified that he looked at the contingent liabilities section of the 1st PFS but, "It said no, so I didn't go any further." **[Tr. Vol. 2, 138:7-9]** He took that statement to mean that "[t]here were no other liabilities," and he took the blank sub-questions in the "CONTINGENT LIABILITIES" section to mean "there was nothing to be concerned on there." **[Tr. Vol. 2, 138:10-21]**

Mr. McWilliams testified that it was his practice that if he needed additional information regarding the loan application or the guarantor to send those questions to Mr. Weinstein. **[Tr. Vol. 3, 56:3-13]** Consistent with his practice, when Mr. Weinstein received questions from SECU's underwriter Mr. McWilliams, he copied and pasted them into emails to Ms. DiPietro and then forwarded her answers to Mr. McWilliams. **[Tr. Vol. 2, 117:22-118:3]** On August 18, 2021, Mr. Weinstein emailed Ms. DiPietro questions that Mr. McWilliams had sent him, including:

> …I see some outstanding judgments against the borrower and/or guarantor. Looks like there is one for Newtek Small Business Finance in the amount of $866M. … And lastly, I see a $245M judgment for American Express National Bank. The Newtek case is open and there was activity on 8/16. …

**[P41]**

On August 23, 2021, Mr. Weinstein emailed Ms. DiPietro with three questions that he copied and pasted from an email from Mr. McWilliams. **[P65; Tr. Vol. 2, 154:1-155:1]** The two questions pertinent to this case are:

1. So the $700,000 portion of the SBA 7a loan from Newtek is legitimate? The case of fraud is about them telling the SBA that $1.46MM was lent? What are the terms of repayment for the $700M loan?
    a. The motion to stay is not a motion to dismiss. The case is still ongoing and awaiting a response from the SBA Inspector General, correct? If the SBA IG testifies in your favor, how does this impact the amount owed on the 7a loan?

…

3. I don't see anything referring to the American Express National Bank judgment. Please provide documentation about this case.

**[P65]**

Ms. DiPietro answered those questions by email less than one hour later:

> #1: Newtek – There is nothing legitimate about the Newtek loan. They approved us for $770,000 (told the SBA they approved us for $1,460,000). After all fees were paid to Newtek we only received about $700,000; we made payments of $152,000; then learned that Newtek wasn't applying our payments, instead they were pocketing them. Then Newtek fraudulently tried to call the SBA guarantee (over $1,000,000) on the loan. The OIG for SBA opened an investigation. I filed a motion to stay vs. dismiss because I want to [sic] the Freedom of Information Act documetns to become public record. I also want to bring counter claims against Newtek. Counter claims would exceed any amount Newtek could claim due – however, it's my understanding Newtek will be held liable for any balance due since they violated Federal Regulatory code, provided me with a fraudulent loan, and defrauded the United States.
>
> …
>
> #3: Amex – The Amex charges were the result of employee theft; and we have a settlement. See attached.

**[P65]**

Ms. DiPietro attached to that email the one-page AMEX Stipulation of Dismissal. **[P65]** She admitted in her testimony that it was the only document she gave

to SECU about the AMEX Judgment. **[P65; Tr. Vol. 2, 87:2-6, 89:4-14]** As she testified, "I didn't provide a copy of the AmEx lawsuit to SECU." **[Tr. Vol. 2, 89:3]**

The representation that Ms. DiPietro made to SECU in her August 23, 2021, email that the AMEX debt was settled was materially false, and Ms. DiPietro had actual knowledge at the time she made that statement that the settlement had been vacated by the Circuit Court for Baltimore County earlier that year on May 6, 2021, in the hearing that she attended.

Similarly, the representations that Ms. DiPietro made to SECU in that email about Newtek were materially false, and she had actual knowledge on that date that she had granted the Newtek DOT on her Landrake Property on July 3, 2018, based on her personal guaranty of that obligation and that the Circuit Court for Baltimore County had entered the Newtek Judgment on June 2, 2021.

Mr. McWilliams testified that he reviewed the information that Ms. DiPietro provided subsequent to the PFS, including in her emails, in totality and that she relied upon that information in conjunction with what Ms. DiPietro provided in the PFS. **[Tr. Vol. 3, 172:1-10]**

Mr. McWilliams testified that he placed "[h]igh reliance" on Ms. DiPietro's representation that the AMEX case was settled and, "as a result of this e-mail, I removed the liability in my analysis. It didn't impact her net worth, nor did it impact her personal debt service coverage ratio." **[Tr. Vol. 3, 118:24-119:14]** In his credit memo, he wrote that "The borrower provided evidence of dismissal of the Amex case and states it resulted from employee theft." **[P38, SECU000266]**

Similarly, he testified that he believed the statements that Ms. DiPietro made in her email concerning the Newtek Judgment not being legitimate "[b]ecause of the chain of responses and her ability to respond to these questions and provide documentation to satisfy

them" **[Tr. Vol. 3, 114:12-14]**, which included Ms. DiPietro's adamant representations and documentation that her company and she "were the victims of serious financial crimes" and that she was a "registered Department of Justice crime victim." **[P49]** He testified that she was "emphatic" about the state of the Newtek matter and "[s]he was clear that there was nothing legitimate about the Newtek liability." **[Tr. Vol. 3, 172:25-173:15]** In his credit memo, he quoted to Ms. DiPietro's August 23, 2021, email and wrote, "The borrower states, 'it's my understanding Newtek will be held liable for any balance due since they violated Federal Regulatory code, provided me with a fraudulent loan, and defrauded the United States.'" **[P38, SECU000266]**

**Underwriting the Loan**

Mr. McWilliams was SECU's credit analyst, serving as the underwriter for the Loan in 2021. **[Tr. Vol. 3, 47:3, 52:5-11]** He testified that he accepted loan applications that were submitted by the account officers, such as Mr. Weinstein, would review the application and financial documents that had been uploaded to the share drive and then pull credit, conduct a financial ratio analysis and other financial analysis, then draft a narrative credit memo. Lastly, if the loan was within his lending authority, he would make the decision on whether to approve or decline the loan. If it was outside of his lending authority, then he would give it to the appropriate authority, which was generally the credit manager Rodney Reed, unless it was above his authority. **[Tr. Vol. 3, 47:3-21]** He testified that in August 2021 his secured lending authority was $1 million, and his unsecured lending authority was $100,000, and the Holdings Loan was secured. **[Tr. Vol. 3, 47:24-48:9]** So Mr. McWilliams had authority to approve or decline the Loan without Mr. Reed's approval.

Mr. McWilliams testified that he pulled Ms. DiPietro's credit, reviewed her personal financial statement, reviewed her tax returns, used the Sageworks program to craft a personal

income statement, a personal cash flow statement. **[Tr. Vol. 3, 54:17-22, 55:25-56:1]** He did a Maryland Judiciary Case Search to search for judgments or liens against the guarantor, which was SECU's standard practice. **[Tr. Vol. 3, 57:19-58:2]** He used Microsoft Excel to create tables to track the guarantor's debts that showed up on their credit report, including their personal mortgages, auto loans, credit cards, etc. **[Tr. Vol. 3, 55:12-17]** He then copied and pasted those tables into the narrative credit memo that he was drafting for the Loan. **[Tr. Vol. 3, 55:17-19]**

Mr. McWilliams testified that the personal guaranty was affected by the guarantor's credit score (their credit strength was a "significant factor") **[Tr. Vol. 3, 50:15-51:1]**, but it "is also affected by other means of determining the character of the personal guarantee which would be other past lending history. It would be past liens or litigation, things like that." **[Tr. Vol. 3, 51:5-12]** He testified that the guarantor's "personal assets would be considered part of their capital and a source of loan repayment…." **[Tr. Vol. 3, 51:18-20]**

He testified that the PFS "is where we understand a guarantor's assets and liabilities from. They report and disclose their assets and the liabilities." **[Tr. Vol. 3, 56:17-19]**

Mr. McWilliams testified that in SECU's standard underwriting practices for commercial loans that were not secured by real estate, "a lot of real estate procedures don't apply such as ordering an appraisal, checking [SDAT] for [valuation], checking that real estate taxes are paid." **[Tr. Vol. 3, 58:9-17]** He testified that SECU did not have any standards for double-checking the valuations of property that the guarantor reported in the PFS, in non-real-estate-backed loans such as the Loan. **[Tr. Vol. 3, 58:24-59:4]** He testified it was "outside of the normal procedure for this kind of loan" to do a land records search for consensual mortgages or liens on the property. **[Tr. Vol. 3, 167:1-7]**

He testified that SECU's standard practice at the time of the Loan regarding lawsuits was to use Maryland Judiciary Case Search and, "if it looks open ended to ask the account officer [Mr. Weinstein] to inquire further to see if there is an update that perhaps we are not aware of." **[Tr. Vol. 3, 59:5-11]** He testified that under SECU's policies and standards, he was not required to go to the courthouse and look at a copy of the case file as part of his underwriting. **[Tr. Vol. 3, 59:12-15]**

Mr. McWilliams testified that SECU placed "[h]igh reliance" on PFS's because:

> It is the document which helps us to understand a guarantor's capital which is one of the five c's of credit as well as their character. The capital is their assets which as a guarantee of the loan, they will do what is in their ability to convert those assets into cash which then prepays loans. This document also lists liabilities and so it helps us understand what other obligations [they] have.
>
> And it provides detail in the form of the different schedules as to like with cash – how much cash? Where is the cash held? Real estate, owners of real estate….
>
> …
>
> …Lots of things today are public knowledge but not everything is public knowledge. When we do our searches, it is possible things are not up to date on you know, whether it is a State's websites or whatever. So the PFS is an opportunity for the guarantor to disclose things to us and make us aware of their financial standing as of the date that they list on the PFS and sign it.
>
> Also, it is important because without the application signed, we don't have the authority to pull somebody's credit and I can't really process a loan without pulling the guarantor's credit. It also is – helps to understand their character which I mentioned was one of the five c's of credit. To know that they are making true statements on it and are trustworthy and credit worthy individual.

**[Tr. Vol. 3, 65:11-66:15]**

Mr. McWilliams placed "heavy reliance" on the paragraph above Ms. DiPietro's signature in the 1st PFS, specifically with respect to her certification that the information was true and accurate: "[W]e rely on that because it gives you kind of the teeth of the law and the person signing this should know that they are giving accurate information and there is a consequence for not doing so. … I accepted that it was true and accurate. I internalized it that

numbers in this statement are correct." **[Tr. Vol. 3, 70:1-14]** He believed the information provided was "100 percent" true and accurate. **[Tr. Vol. 3, 70:18-21]** He was trained at SECU "to assume that the numbers [in the PFS] are accurate." **[Tr. Vol. 3, 70:22-24]** He testified that substantial mistakes in a PFS are "not common." **[Tr. Vol. 3, 71:14-25]**

Mr. McWilliams testified that he performed the underwriting in a manner consistent with SECU's standards, practices and policies. **[e.g. Tr. Vol. 3, 173:16-19]**

Mr. McWilliams testified as to the findings and conclusions of his credit memo **[P38]** and the Commercial Credit Request Summary **[P36]**. He explained that he performed a debt service coverage ratio ("DSCR") analysis for Holdings, Ms. DiPietro and for both (a global DSCR, or "GDSCR") **[Tr. Vol. 3, 59:16-61:20]** and that the DSCR's "are independently and individually analyzed, so if one fails, I am unlikely to move forward with approval."[10] **[Tr. Vol. 3, 61:19-20]** Under SECU's policy standards at the time, Mr. McWilliams lacked authority to move forward if the personal DSCR was too low and would only be able to proceed if he obtained approval of an exception from the credit manager Mr. Reed, something that he did not do here. **[Tr. Vol. 3, 61:21-62:8]** In fact, under SECU's standards, Mr. McWilliams' recommendation was required for the Loan to be approved. **[Tr. Vol. 3, 62:23-25]**

Mr. McWilliams testified, and his credit memo reflects, that Ms. DiPietro's personal DSCR was at an acceptable level. **[Tr. Vol. 3, 62:12-17]** He testified that, had Ms. DiPietro disclosed to SECU that she had business losses for the year 2020 (as she subsequently reported on her tax return), it would have reduced her DSCR. **[Tr. Vol. 3, 129:22-14]**

He testified that he did not include the AMEX Judgment or the Newtek Judgment in the "Yearly Recurring Debt Payments" in his calculation of Ms. DiPietro's personal DSCR.

[10] The Business Loan Agreement provided, "**Debt Service Coverage Ratio (DSCR).** Borrower shall maintain a minimum Debt Repayment Capacity of 1.25:1 tested on annual basis, beginning with the first annual review…." **[P32, SECU001158 (emphasis in original)]**

**[P38, SECU000264; Tr. Vol. 3, 130:15-22]** He testified that SECU's standard practice with factoring judgments into the "Yearly Recurring Debt Payments" calculation is to either use the payment plan amount (if the guarantor has one) or, if no payment plan, then to amortize the entire judgment over a period not longer than five years. **[Tr. Vol. 3, 131:10-24]** He testified that, had he included either the AMEX Judgment or the Newtek Judgment, even if amortized over a five-year period, either would have brought Ms. DiPietro's personal DSCR down to an "unacceptable" level. **[Tr. Vol. 3, 131:25-132:3; 132:13-133:3]** If either the AMEX Judgment or the Newtek Judgment were included in the personal DSCR calculation, Mr. McWilliams would have declined the application. **[Tr. Vol. 3, 133:4-7]** Additionally, and as an alternative defect to the Loan application, had the AMEX Judgment and Newtek Judgment been factored into the GDSCR, it would have brought the GDSCR to an "unacceptable" level. **[Tr. Vol. 3, 137:23-138:7]**

Mr. McWilliams also testified that under SECU's standard practice, the Ms. DiPietro's net worth needed to be positive in order for the Loan to be approved, and he would not have had authority to make the Loan without seeking an exception, which he didn't do. **[Tr. Vol. 3, 97:15-98:2]** Ms. DiPietro's net worth had a margin of $239,835, meaning that if her assets decreased and/or her liabilities increased by more than that number, she would have had a negative net worth, which would have disqualified Holdings from the Loan. **[Tr. Vol. 3, 135:2-6]**

He testified that, had the Newtek DOT been factored in, that by itself would have caused her net worth to have been negative, which would have resulted in the Loan being declined. **[Tr. Vol. 3, 96:19-97:8, 115:4-24, 135:11-13]** Similarly, he testified that had he factored in the AMEX Judgment, that alone would have made Ms. DiPietro's net worth negative, which would have resulted in the Loan being declined. **[Tr. Vol. 3, 119:11-15, 135:7-10]**

He testified that, had he known that Ms. DiPietro would testify under oath, as she did in her meeting of creditors, that she was to come off the title to the Ellison Property, he would have not included it as an asset of hers, and her net worth would have lowered by $386,250, which would have lowered her net worth to a negative number and Mr. McWilliams not recommending approval of the Loan. **[Tr. Vol. 3, 174:22-175:18]** Further, had the Landrake Property been valued in the PFS as less than $615,000, it would have further decreased Ms. DiPietro's net worth.

However, because of SECU's reliance on Ms. DiPietro's representations about her assets and liabilities, Ms. DiPietro's personal DSCR was at an acceptable level, the GDSCR was at an acceptable level, and Ms. DiPietro's net worth was positive. Therefore, Mr. McWilliams recommended approval of the Loan. **[P38, P36]** Mr. Reed also approved the Loan, even though he didn't have to. **[*Ids.*; Tr. Vol. 4, 11:2-6]** Mr. Reed testified that he relied upon Mr. McWilliams' credit memo in approving the Loan and upon the accuracy of the financial information that Ms. DiPietro gave to SECU. **[Tr. Vol. 4, 21:3-16, 23:14-17]** Had Mr. Reed known that the information in the PFS was inaccurate, he would not have approved the Loan. **[Tr. Vol. 4, 23:18-21]**

Mr. Weinstein signed the Business Loan Agreement for the Loan on September 8, 2021. **[P32; Tr. Vol. 2, 162:21-163:6]** Ms. DiPietro made various representations and warranties in the Commercial Guaranty for the Loan that she signed that same day:

> **GUARANTOR'S REPRESENTATIONS AND WARRANTIES:** Guarantor represents and warrants to Lender that … (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which current has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided ….

> **… GUARANTOR'S FINANCIAL STATEMENTS.** …
>
> …
>
> All financial reports required to be provided under this Guaranty shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Guarantor as being true and correct.

**[P32, SECU001153 (emphasis in original)]**

After the Loan was made, Holdings drew the entire $400,000 line of credit over the course of the year. **[Tr. Vol. 1, 200:11-23]**

**Ms. DiPietro's Subsequent Debts**

On November 19, 2021, Ms. DiPietro guaranteed a loan made by the Howard County Economic Development Authority ("HCEDA") to Holdings in the maximum principal amount of $500,000 (the "HCEDA Loan" and "HCEDA Guaranty") **[P63; Tr. Vol. 1, 78:7-20]** and granted an Indemnity Deed of Trust on the Landrake Property for the benefit of HCEDA in that amount (the "HCEDA DOT"). **[P23; Tr. Vol. 1, 72:5-74:5]** She testified that the HCEDA Loan was used to buildout the new Holdings facility in Savage, Maryland, and to "purchase some equipment." **[Tr. Vol. 1, 61:25-62:5, 72:5-9]** She testified that the HCEDA "was part of the negotiation **[*Id.* at 73:17-20]** but, when asked when she began the process of applying for the credit, she testified that she did not remember. **[*Id.* at 74:6-8]** When asked how long it took to get the credit approved and get to closing on the loan documents, she testified that she did not recall but said, "I'm sure it was longer than [a matter of] days," it was "[p]robably" a matter of weeks from when she started applying for the loan to when it was closed, and "[i]t could have been" a matter of months, although she claimed she could not recall. **[*Id.* at 74:9-14, 75-7]**

On January 18, 2022, which was between the making of the initial SECU Loan and Ms. DiPietro's submission of the 2nd PFS for the CTA, Johnson-Lancaster filed a second lawsuit,

this time in the Circuit Court of Maryland for Howard County against Ms. DiPietro and Holdings, alleging fraudulent conveyance of HMC's assets in an effort to delay, hinder or defraud Johnson-Lancaster in the collection of money owed to it, including under the 2021 Johnson-Lancaster Judgment (the "2022 Johnson-Lancaster Suit"). **[P73-P74]** In the 2022 Johnson-Lancaster Suit, Johnson-Lancaster sought, *inter alia*, a money judgment against Ms. DiPietro and Holdings, jointly and severally, in the principal amount of $297,960.71, plus pre-judgment interest, post-judgment interest and costs. **[*Ids.*]**

On May 5, 2022, Ms. DiPietro executed a personal guaranty of two loans made by Sandy Spring Bank to Holdings – one for $1,000,000 and the other for $500,000 (the "Sandy Spring Guaranty"). **[P29; Tr. Vol. 1, 64:9-65:12, 67:5-9]** The Sandy Spring Guaranty was in the combined principal amount of $1,500,000. **[*Ids.*]** Ms. DiPietro testified that she signed the Sandy Spring Guaranty. **[Tr. Vol. 1, 65:5-9]** She testified that the $500,000 loan was a term loan "to pay off our other – you know, some creditors and use some of it as working capital and also maybe for tenant improvements." **[*Id.* at 62:18-62:5]** She testified that the $1 million loan was an accounts receivable line of credit to Holdings "[f]or work in progress and, you know, whatever we needed to further the business operations. … p[]ay suppliers, subcontractors, our payroll, et cetera" and to "bridge the gap" while the company's payment applications to general contractors were pending. **[*Id.* at 62:13-63:15]**

**The 2nd PFS and CTA**

The Loan had a maturity date of September 1, 2022. **[P32, SECU001149]** As the maturity date of the Loan approached, Mr. Weinstein sent Ms. DiPietro multiple emails requesting an updated PFS "for the renewal of the line of credit," first on July 18, 2022, then again on August 2, 2022. **[P54-P55]** Ms. DiPietro represented in an email to Mr. Weinstein on August 15, 2022, that Holdings had "constant and ongoing sales growth" and "significant

growth" **[P50]**, despite the fact that it was barreling toward a corporate bankruptcy filing in 2023.

Ms. DiPietro completed and submitted the 2nd PFS to Mr. Weinstein on or about August 5, 2022. **[P06; Tr. Vol. 1, 168:5-8, 205:22-206:10]** She submitted it "because "[h]e [Mr. Weinstein] asked me to." **[Tr. Vol. 1, 206:16-17]**

The 2nd PFS actually showed a decrease in total liabilities, from $838,250 to $735,000 **[P06]**, which is grossly inaccurate, particularly because (a) the 1st PFS did not disclose the Newtek Judgment or AMEX Judgment, which totaled more than $1 million; and (b) in the intervening time period since Ms. DiPietro's submission of the 1st PFS, she had guaranteed another $2 million in liabilities to HCEDA and Sandy Spring Bank.

The 2nd PFS reported a total income of $665,618, despite the fact that, again, Ms. DiPietro's 2020 tax return reported a total income of $126,545 **[P40]** and her Petition that was filed about nine months later reported a monthly income of $13,952.99, which annualizes to $167,435.88. **[P07, SECU000826-827]**

The 2nd PFS left blank the contingent liabilities question and all of the sub-questions, implying that she had no contingent liabilities and that nothing had changed in that regard from the 1st PFS. **[P06]** In addition to the other contingent liabilities and guarantees that were applicable at the time of the 1st PFS, in the subsequent year Ms. DiPietro had also provided the HCEDA Guaranty for $500,000 and the Sandy Spring Guaranty for $1,500,000. However, neither were disclosed to SECU. **[P06]** She also did not disclose in the 2nd PFS that she had been sued by Johnsonn-Lancaster in the 2022 Johnson-Lancaster Suit, in which case the plaintiff sought a money judgment against her in the principal amount of $297,960.71.

Similar to the 1st PFS, it stated that there were "No" "assets pledged other than as described on schedules" **[P06]**, despite the fact that, in addition to the Newtek DOT and the

judgment liens from the Newtek Judgment and AMEX Judgment, Ms. DiPietro had also granted the HCEDA DOT for $500,000.

As with the 1st PFS, in the 2nd PFS Ms. DiPietro did not itemize any of her debts over $1,000, despite the instructions on Page 2 of the PFS to do so. **[P06]**

Regarding real estate, Ms. DiPietro increased both the valuations for the Landrake Property and the Ellison Property. She increased the valuation of Landrake from $615,000 to $725,000, even though about nine months later she valued it in her Petition as $460,000. **[P05; P06; P07 at SECU000794]** She also lowered the reported monthly mortgage payment on the Landrake Property from $2,864 per month in the 1st PFS to $2,600 per month in the 2nd PFS. **[P05, P06]**

Ms. DiPietro increased the valuation of the Ellison Property from $515,000 in the 1st PFS to $585,000 in the 2nd PFS. **[P05, P06]** As with the 1st PFS, she wrote "n/a" in the column asking for the "Balance Owed ($)" on the mortgage for that property. **[P06]** But in the 2nd PFS, unlike in the 1st PFS, she left blank the column asking for the "Mortgage Held by Pymt(s) per month." **[P06]** Those two columns, taken together, represented to SECU that there was no mortgage on the Ellison Property, when, in fact, there still was, and Ms. DiPietro had signed the deed of trust for it. **[P10]** Mr. Reed testified that her would conclude from the 2nd PFS regarding the Ellison Property that "there was no balance and there would be no payment." **[Tr. Vol. 4, 39:17-19]**

On "SCHEDULE C (DEBTS OWED TO FINANCIAL INSTITUTIONS)" of the 2nd PFS, Ms. DiPietro increased the listed debts from $21,520 to $42,000. **[P06]** However, she did not mention any of the major debts that she had incurred, including, without limitation, the Sandy Spring Guaranty of $1,500,000, the Newtek Judgment or the AMEX Judgment.

Similarly, she left the catch-all "SCHEDULE D – DEBTS AND ACCOUNTS OWED TO OTHERS" blank, as she had in the 1st PFS.

Mr. Reed testified that in comparing the 1st PFS to the 2nd PFS at the time of underwriting for the CTA, he noted that "there hadn't been much change" in the assets and liabilities, "[s]o there was at least some comfort that we were in the same position as we were when we did the line." **[Tr. Vol. 4, 29:9-13, 32:11-12]**

He testified that Ms. DiPietro did not disclose the AMEX Judgment to SECU, to his knowledge. **[Tr. Vol. 4, 30:14-18]** He testified that Ms. DiPietro did not disclose to SECU that she had entered into the HCEDA Guaranty **[Tr. Vol. 4, 29:16-19]**, which would have made the DSCR "tighter." **[Tr. Vol. 4, 35: 13-19]** and that, had she disclosed to SECU that she had entered into the Sandy Spring Guaranty, "It probably would have made it tighter and harder to go with the term-out." **[*Id.* at 29:20-25]**

Mr. Reed used Mr. McWilliams' original credit memo and updated it in connection with the CTA application and signed it. **[P35; Tr. Vol. 4, 33:23-34:5-8]** Mr. Reed then signed the Commercial Credit Request Summary noting that the CTA was approved. **[P35; Tr. Vol. 4, 36:22-37:3]**

After obtaining the CTA, Holdings made one payment, then defaulted on the Loan. **[Tr. Vol. 4, 27:5-7]** From there, SECU filed a confessed judgment action against Holdings and Ms. DiPietro in the Circuit Court for Baltimore County, and on February 6, 2023, the Circuit Court entered a confessed judgment against them, jointly and severally, in the principal amount of $393,993.90; plus pre-judgment interest through January 25, 2023, of $8,038.57; plus additional pre-judgment interest from January 25, 2023, through February 6, 2023, at the per annum rate of 11.5% ($125.85 per day); plus late charges of $1,175.49; plus reasonable attorneys' fees through January 26, 2023, of $891.00; plus court costs; plus post-judgment

interest at the contractual rate of 11.5% from February 6, 2023, until the maturity date of September 1, 2027, pursuant to Md. Code Ann. Cts. & Jud. Proc. § 11-106(a) and thereafter at the statutory rate of 10% per annum, pursuant to Md. Code Ann. Cts. & Jud. Proc. § 11-107(a) (the "Judgment"). **[P33, P34]** Ms. DiPietro did not file a motion to vacate, open or modify the Judgment after service. Ms. DiPietro filed the instant personal bankruptcy on May 11, 2023. **[P07]**

**<u>Standard of Review</u>**

Pursuant to 11 U.S.C. § 523(a)(2)(B):

> "A discharge under section 727 … of this title does not discharge an individual debtor from any debt –
>
> …
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
>
> …
>
> (B) use of a statement in writing –
>
> (i) that is materially false;
>
> (ii) respecting the debtor's or an insider's financial condition;
>
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
> (iv) that the debtor caused to be made or published with intent to deceive….

11 U.S.C. § 523(a)(2)(B).

A plaintiff must prove its claim(s) for non-dischargeability under § 523(a)(2)(B) by a preponderance of the evidence – that is, that the facts are more likely than not to have occurred. *See Guaranty Residential Lending, Inc. v. Koep (In re Koep)*, 334 B.R. 364, 371 (Bankr. D. Md. 2005).

An exception to discharge under Section 523(a)(2)(B) is to be "strictly construed against creditors in order to protect a debtor's fresh start," *id.*, citing *Spinoso v. Heilman (In re Heilman)*, 241 B.R. 137, 148 (Bankr. D. Md. 1999). "The Supreme Court has long cautioned against broad constructions of § 523 because they 'would be incompatible with the well-known guide that exceptions to discharge should be confined to those plainly expressed.'" *Crocker v. Matthews (In re Matthews)*, 599 B.R. 838, 861 (Bankr. D. Md. 2019), quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 62 (1998).

However, this Court has also recognized that the debtor's pursuit of a fresh start is not absolute:

> Conversely, it is also well-settled that this court must be "equally concerned with ensuring that perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code." *Id.* [*Kawaauau* at 62] As the Supreme Court has indicated, while the Bankruptcy Code provides a debtor with a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt, the Bankruptcy Code also limits that opportunity to the "honest but unfortunate debtor." *Brown v. Felsen*, 442 U.S. 127, 128, 99 S. Ct. 2205, 60 L.Ed.2d 767 (1979) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934)).

*Id.*

## <u>Argument</u>

### I. Ms. DiPietro is an "individual debtor."

Ms. DiPietro is an individual debtor under § 523. On May 11, 2023, she filed for personal bankruptcy, initially under Subchapter V of Chapter 11, ultimately converting to Chapter 7. **[P07]** She personally guaranteed the Loan and Change in Terms in her individual capacity **[P03, P32]** and provided financial statements and other written statements to SECU regarding her personal financial condition in connection with the initial Loan and the Change in Terms. **[P05, P06]** SECU's confessed judgment on the Loan was entered against Ms.

DiPietro and Holdings, jointly and severally, on or about February 6, 2023, prior to her bankruptcy filing. **[P33, P34]**

## II. The debt was "for money, … or an extension, renewal, or refinancing of credit…."

Under Section 523(a)(2), the debt subject to the nondischargeability complaint must be "…for money, property, services, or an extension, renewal, or refinancing of credit…." *Id.* The scope of § 523(a)(2) has been broadly interpreted by the Fourth Circuit, even to the point of including forbearance:

> An extension of credit is analogous to the classic forbearance granted by a creditor in relation to a matured debt. Extensions of credit under § 523(a)(2) are thus properly viewed as merely an agreed enlargement of the time allowed for payment. … **The terms used in § 523(a)(2) are thus broad enough to account for virtually every type of secondary debt transaction.**

*In re Biondo*, 180 F.3d 126, 132-33 (4th Cir. 1999) (emphasis added).

Here, the Loan was initially a revolving line of credit for up to $400,000 of principal, constituting a debt "for money, … or an extension … of credit…." *See* § 523(a)(2). Holdings tapped the entire line during the first year of the Loan, and principal balance due as of the execution of the CTA on or about September 6, 2022, was $400,000. By entering into the CTA, SECU made an "extension, renewal, or refinancing of credit….." *See* § 523(a)(2)(B)(2). The evidence and testimony at trial was undisputed that SECU, in fact, loaned the principal sum of $400,000 to Holdings and that, as of the date the Judgment was entered, the principal balance owed under the Loan was $393,993.90. The Loan documents reflecting the Loan and CTA were stipulated to by the parties.

## III. Ms. DiPietro "use[d] … a statement in writing…."

Under Section 523(a)(2)(B), the debtor must have made "…use of a statement in writing…." *Id.* As this Court has explained:

> …The Fourth Circuit has long held that such a statement need not be a formal financial statement to fall within the scope of §523(a)(2)(B). *Engler v. Van Steinburg (In re Van Steinburg)*, 744 F.2d 1060 (4th Cir. 1984). As this court has also previously pointed out, "with respect to the first element, the statement must have been either written by the debtor, signed by the debtor, or written by someone else and then adopted and used by the debtor." *Jones v. Owens (In re Owens)*, 549 B.R. 337, 349 (Bankr. D. Md. 2016). *See also, Hudson Valley Water Res. Inc. v. Boice (In re Boice)*, 149 B.R. 40, 45 (Bankr. S.D.N.Y. 1992) ("It is sufficient that Debtors either wrote, signed, or adopted such statement to find that documents were "written" by them.").
>
> The Fourth Circuit has also long held that for purposes of § 523(a)(2)(B) a statement "respecting" a debtor's financial condition is any statement that has bearing on the debtor's financial status, not just a statement regarding the debtor's overall financial status. *Engler*, 744 F.2d at 1062 ("A debtor's assertion that he owns certain property free and clear of other liens is a statement respecting his financial condition…. Consequently, the statement must be in writing to bar the debtor's discharge.") (citing *Blackwell v. Dabney (In re Blackwell)*, 702 F.2d 490 (4th Cir. 1983)). In *Blackwell*, the Fourth Circuit held that oral representations made by an individual debtor about the financial condition of a corporation that was an insider were "outside the scope of 11 U.S.C. § 523(a)(2) and cannot be the basis for preventing discharge of the bankrupt." 702 F.2d at 492.
>
> The Supreme Court's recent decision in *Lamar, Archer & Cofrin v. Appling*, ____ U.S. ____, 138 S.Ct. 1752, 201 L.Ed.2d 102 (2018), concerning the scope of § 523(a)(2)(B) is particularly significant here. In that case, the Court determined that the bankruptcy court should have dismissed a complaint under § 523(a)(2) for failure to state a claim because the alleged false statement was an oral one concerning a ***single asset*** of the debtor. The Court specifically rejected the interpretation that a statement "respecting" a debtor's financial condition only referred to statements encompassing the debtor's overall financial status. The statement must simply have "a *direct relation to or impact on the debtor's overall financial status*." *Id.* at 1761 (emphasis added). Given this, the Court found "[a] single asset has a direct relation to and impact on aggregate financial condition, so a statement about a single asset bears on a debtor's overall financial condition and can help indicate whether a debtor is solvent or insolvent, able to repay a given debt or not." *Id.* ...

*Crocker v. Matthews (In re Matthews)*, 599 B.R. 838, 862-63 (Bankr. D. Md. 2019) (emphasis in original).

This Court has noted that, "In this Circuit, the term 'financial condition' is properly given a broad scope. Its meaning reaches well beyond a 'formal' financial statement that merely lists columns of assets and liabilities in the traditional manner." *Jones v. Owens (In re*

*Owens)*, 549 B.R. 337, 349-50 (Bankr. D. Md. 2016). *Owens* held that emails were sufficient to constitute a written statement. *Id.* at 351.

Here, Ms. DiPietro used several written statements to induce SECU to make the Loan or the CTA, including the PFS'es and emails.

Mr. Weinstein emailed Ms. DiPietro on August 4, 2021, after their initial intake call, and he requested from her a PFS for purposes of processing the Loan request. Ms. DiPietro emailed Mr. Weinstein her 1st PFS on August 4, 2021. **[P05]** The evidence and testimony at trial was undisputed that Ms. DiPietro filled out and submitted the 1st PFS to SECU as part of the Loan application on August 4, 2021.

After submitting her 1st PFS to Mr. Weinstein and during the underwriting phase of the initial Loan, Ms. DiPietro sent Mr. Weinstein various emails to support the representations in the PFS, including emails that answered Mr. McWilliams' questions that Mr. Weinstein had sent to Ms. DiPietro, including her email to Mr. Weinstein dated August 23, 2021 **[P65]** that represented that "[t]here is nothing legitimate about the Newtek loan," which she stated was a "fraudulent loan" for which "Newtek will be held liable for any balance due since they violated Federal Regulatory code," as well as the email in which she represented that the AMEX debt was settled ("we have a settlement") and attached and adopted the AMEX Stipulation of Dismissal as the status of that case. Additional written statements included her emails dated August 18, 2021 at 12:06 p.m. **[P41]** and 12:26 p.m. **[P49]** that stated that her debt, including the Newtek and AMEX debts, arose from being "victims of serious financial crimes, and in retaliation I have been the victim of litigious abuse" **[P41]** and that those cases were instances of "abusive retaliatory litigation." **[P49]**

Similarly, Mr. Weinstein emailed Ms. DiPietro on July 18, 2022 (and again on August 2, 2022), requesting an updated PFS as part of the CTA. Ms. DiPietro filled out and submitted the 2nd PFS to SECU as part of the CTA on August 5, 2022. **[P06]**

### IV. The statements were materially false.

As this Court has explained:

> A written statement is materially false if it paints a substantially untruthful picture of the defendant's financial condition by misrepresenting information of the type that would normally affect a plaintiff's decision to grant credit. *In re Davis*, 262 B.R. at 680. Mere inaccuracy is not sufficient, rather, material falsity requires a significant understatement of liabilities or exaggeration of assets.

*Koep v. Koep (In re Koep)*, 334 B.R. 364, 373 (Bankr. D. Md. 2005). "A relevant inquiry is 'whether the lender would have made the loan had he known the debtor's true situation.'" *In re Owens* at 350, quoting *In re Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985).

Here, the 1st PFS and 2nd PFS, as well as her emails sent in furtherance thereof, were replete with materially false statements that painted a substantially untruthful picture of Ms. DiPietro's financial condition in both August 2021 and August 2022. It should be noted that the PFS'es specifically state in the paragraph above Ms. DiPietro's signature that she was certifying the truthfulness and accuracy of the PFS'es **[P05, P06]**, and that the Loan documents contained a representation and warranty that all financial information she provided to SECU was true and correct in all material respects. **[P32, SECU001153]**

On the first page of her PFS, she represented that she had only $45,250 of "Debt Owed to Banks (Schedule C)," $518,000 in "Real Estate Mortgages (Schedule A)" and $25,000 of "Other Liabilities." **[P05]** However, because she reported that the mortgage balance on the Landrake Property was $379,760 and the Ellison Property sold at short sale for $515,000 in 2024 and was not refinanced before then, it's clear that she underreported the balance of her

mortgage debt by more than $300,000. It's also clear, as set forth below, that she omitted significant debts from the $70,250 of debts owed to banks and other liabilities on Page 1.

Ms. DiPietro substantially overinflated her total income in the 1st PFS, representing that she had earned $503,284, when it was later revealed (after the making of the Loan) that she had reported in her 2020 federal tax return that she had earned a total income of only $126,545 in 2020, which was the last complete year prior to the date of the 1st PFS. She exaggerated her income by $376,739.

In the 1st PFS, Ms. DiPietro answered "No" to the question of whether she had any contingent liabilities, despite the fact that she had guaranteed the Newtek Loan, would later testify in her meeting of creditors that she filed for bankruptcy because she had been "required to personally guarantee pretty much everything from the buyer agreements to bank financing," **[P55, 3:6-17]** and was obligated under the deed of trust for the Ellison Property, the mortgage for which she testified her ex-husband was paying. She also failed to disclose that mere days before she had made the Formstack submission to SECU for the Loan, Johnson-Lancaster and the receiver had filed the Contempt Petition against her for allegedly violating the Receivership Order, seeking monetary damages against her of $30,000.

She did not itemize any lawsuit-related debts, as required by the top of Page 2 of the PFS, which she testified that she saw. The 1st PFS omitted more than $1 million of debt from judgments that had been entered against Ms. DiPietro mere months before she submitted the PFS to SECU, including the $865,747.74 Newtek Judgment and the $244,719.09 AMEX Judgment.

She misrepresented to SECU that she had not pledged any assets, when, in actuality, she had granted the Newtek DOT on the Landrake Property and had granted a deed of trust on her interest in the Ellison Property. Both omissions were even more egregious because, she

testified, her ex-husband was on a hardship extension on the mortgage for the Ellison Property **[P55, SECU001235, 17:2-3]**, and the Newtek Loan was already in default and had proceeded to a judgment, so the Newtek DOT was in jeopardy of being foreclosed. **[P22 at SECU000979, § 23]** Further, the Newtek Judgment and AMEX Judgment were both judgment liens on the Landrake Property and her interest in the Ellison Property.

She misrepresented the value of the Landrake Property as $615,000, when none of the valuations that she introduced into evidence at trial reflected a value any higher than $548,900. Most telling, when she filed for bankruptcy in May 2023, she reported the value of Landrake at $460,000, which is the same as the purchase price when she bought it in 2017. She overinflated the value of the Landrake Property on her 1st PFS when it served her goal of getting the Loan approved and then deflated the value of the property in her Petition when it served her goal of protecting her residence from being sold.

She represented to SECU in the 1st PFS that she had an interest in the Ellison Property as a co-owner, although she later testified in her meeting of creditors that she should have come off the title, something she did not disclose to SECU. She let SECU believe that she had a 50% interest in that property. She then misrepresented that there was not a mortgage on the Ellison Property by writing “n/a” in the “Balance Owed” column. In truth, she was a borrower on the Ellison mortgage and a grantor of the deed of trust for that mortgage. Her misstatements led SECU to believe that she had an unencumbered one-half interest in the Ellison Property, which was not the case. Ultimately, the Ellison Property sold at short sale because it was fully encumbered.

She had another opportunity in Schedule A to disclose the Newtek DOT as a consensual lien, and the Newtek Judgment and AMEX Judgment as judgment liens, against her interest in the properties, but she did not do so, making it seem that there was $235,240 in equity in the

Landrake Property and $25,000 of equity in the Ellison Property, when, in fact, there was no equity in her interest in either one.

She significantly underreported her debts owed to financial institutions in Schedule C of the 1st PFS, merely reporting $21,520 but omitting, for example, the Newtek Loan, which was an SBA loan, and the Ellison mortgage, which she was obligated on as a borrower. Then, she left the catch-all debt section (Schedule D) completely blank, representing that there were no other debts.

In her emails supporting her statements in the 1st PFS, she mispresented that the AMEX debt was settled and attached a copy of the one-page AMEX Stipulation of Dismissal. In fact, although the AMEX case had at an earlier time been settled, in February 2021 AMEX had filed a motion to vacate that dismissal due to an alleged breach of the settlement agreement by Ms. DiPietro and HMC, and the Circuit Court for Baltimore County had granted the motion and entered a judgment against Ms. DiPietro on May 6, 2021, in the total amount of $244,719.09. She had actual knowledge of that fact because she attended the hearing. Thus, her statement to SECU that the AMEX debt was in a "settlement" was materially false.

Her statements in her emails that the Newtek debt was illegitimate were materially false. In actuality, Newtek had filed a confessed judgment suit against her in 2021, and the Circuit Court for Baltimore County had entered the confessed judgment against her earlier that year, on February 10, 2021, in the total amount of $865,747.74.

These misstatements were material to SECU. Overall, they painted an untruthful picture of her financial situation. They led SECU to believe that she had unencumbered assets that were valued higher than they really were, that she earned hundreds of thousands of dollars per year more than she really did, that she had relatively minor non-mortgage debts and that she was a good credit risk.

SECU's representatives testified that they would not have made the Loan to her had they known these facts. They testified that SECU's policies required that any 20% or greater owner of a borrower entity provide a personal guaranty as an absolute rule, unless an exception is given by lending committee, which was not done here. Mr. McWilliams testified that the business and individual DSCR analyses were independent of each other, so it would not have been sufficient that the business had an acceptable DSCR ratio, if Ms. DiPietro did not. Here, he testified that the Newtek Judgment or the AMEX Judgment would have been enough to ruin the personal DSCR figures.

Further, Mr. McWilliams testified that under SECU's policies Ms. DiPietro could not have had a negative net worth for the Loan to have been approved. He testified that her net worth had a margin of $239,835, so if her assets were reduced and/or her liabilities increased by a number greater than that, she would have been ineligible for the Loan. Had Mr. McWilliams factored in the Newtek Judgment or the AMEX Judgment, Ms. DiPietro would have had a negative net worth, and the Loan application would have been denied. Further, had he removed the Ellison Property, that alone would have made her net worth negative. [11]

The 2nd PFS contained virtually all of the same misrepresentations of the 1st PFS but also several more egregious material misrepresentations. It left blank the contingent liabilities section (and sub-questions, including whether she had guaranteed any obligations), when, in actuality, she had guaranteed an additional $2 million of debts over the prior year, including the $500,000 HCEDA Guaranty and the $1,500,000 Sandy Spring Guaranty. It, again, stated that she had not ("No") pledged any assets, when she had pledged the Landrake Property as collateral for the HCEDA Guaranty by granting the HCEDA DOT.

---

[11] Of course, to the extent that the Landrake Property was worth less than what she scheduled – for example, if it was valued at $460,000, which she used in her bankruptcy Petition – it would have brought her net worth closer to being negative. Further, if the other multitude of business debts that she testified in her meeting of creditors that she had guaranteed were factored in, it would have further tanked her net worth.

She further increased her stated total income from $503,284 to $665,618. However, not only did her 2020 tax return report an income of $126,545, but her Petition (filed less than nine months later) reported a monthly income of $13,952.99, which annualizes to $167,435.88. In either event, she overinflated her income by approximately $500,000.

In the 2nd PFS, she increased the value of the Landrake Property from $615,000 to $725,000, even though in her Petition less than nine months later she valued it at $460,000, resulting in a $265,000 inflation of that asset. She clearly represented there was no mortgage on the Ellison Property because she wrote "n/a" into the "Balance Owed" column but also left blank the column entitled, "Mortgage Held by Pymt(s) per month," when, in fact, the Ellison mortgage remained and fully encumbered that property.

She also failed to disclose to SECU that she had been sued earlier that year by Johnson-Lancaster for fraudulent conveyance, seeking a money judgment against her in the amount of $297,960.71.

Mr. Reed testified that, in performing the underwriting for the CTA, he reviewed both of the PFS'es and compared them. He noted that "there hadn't been much change" in the assets and liabilities, "[s]o there was at least some comfort that we were in the same position as we were when we did the line." **[Tr. Vol. 4, 29:9-13, 32:11-12]**

He testified that Ms. DiPietro did not disclose the AMEX Judgment to SECU, to his knowledge. **[Tr. Vol. 4, 30:14-18]** He testified that Ms. DiPietro did not disclose to SECU that she had entered into the HCEDA Guaranty **[Tr. Vol. 4, 29:16-19]**, which would have made the DSCR "tighter." **[Tr. Vol. 4, 35: 13-19]** and that, had she disclosed to SECU that she had entered into the Sandy Spring Guaranty, "It probably would have made it tighter and harder to go with the term-out." **[*Id.* at 29:20-25]** Clearly, because, under Mr. McWilliams' 2021 analysis, Ms. DiPietro's DSCR would already have been too low prior to 2022, it only would

have gotten worse with the addition of the HCEDA Guaranty, the Sandy Spring Guaranty and the Johnson-Lancaster fraudulent conveyance suit.

In short, Ms. DiPietro used the PFS'es and her supporting emails to paint a substantially untruthful picture of her financial condition to SECU. She significantly understated her liability and overstated her assets. SECU would not have made the Loan had it known the truth of her financial condition.

**V. The statements respected the debtor's or an insider's financial condition.**

The written statements made by Ms. DiPietro respected her financial condition.

**VI. SECU reasonably relied on the statements.**

"The reasonable standard is usually met by evidence that the loan would not have been extended if accurate information about the borrower's financial status had been disclosed." *In re Koep*, 334 B.R. at 373, citing *Master Financial, Inc. v. DeJulio (In re DeJulio)*, 322 B.R. 456, 461 (Bankr. M.D.Fla. 2005). "Several factors are considered in determining whether a plaintiff reasonably relied upon a false financial statement: (1) creditor's standard practice in evaluating whether a borrower is creditworthy; (2) standards or customs in the industry in evaluating creditworthiness, i.e., what constitutes a commercially reasonable investigation of the data supplied by a potential borrower[12]; and (3) circumstances that exist at the time of the application for credit, i.e., whether there are any indications (or 'red flags') that would alert an ordinarily prudent lender to the possibility that the data is inaccurate." *In re Koep* at 373.

Under *In re De Julio*, cited by this Court in the *Koep* decision:

> Whether a creditor's reliance is reasonable is a question of fact to be judged in light of the totality of the circumstances. A bankruptcy court may consider, among other things: 1) whether there had been any previous business dealings

[12] As these are factors and not elements, an expert witness is not required. In *In re Owens*, 549 B.R. 337 (Bankr. D. Md. 2016), it appears that no experts were called, the opinion does not mention any analysis on that point and the Court found what was reasonable seemingly in the absence of an expert witness. Likewise, in *In re De Julio*, the Court did not analyze the industry custom and practice in its opinion, while finding that the plaintiff's reliance was reasonable.

> with the debtor that gave rise to a relationship of trust; 2) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; 3) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations; 4) the creditor's standard practices in evaluating credit worthiness; and 5) the standards or customs in the creditor's industry in evaluating creditworthiness.

*In re De Julio*, 322 B.R. at 462; *see id.* at 463 ("While minimal investigation would have revealed the inaccuracy of Defendant's representations as to her income and assets, the very nature of a stated income loan is the mortgagee's reliance on the income and assets stated on the application.")

Under *In re Coughlin*, also cited by this Court in the *Koep* decision:

> Once reliance on the financial statement is established, most courts have held that a showing of partial reliance is sufficient: the creditor need not demonstrate that it was motivated solely by the false financial information. All that is required is that the financial statement was a "'contributory cause of the extension of credit.'" Evidence demonstrating that the loan would not have been granted if the lender had received accurate information is sufficient to show reliance.

*Id.*, 27 B.R. 632, 637 (1st Cir. BAP 1983) (internal citations omitted).

The record reflects that SECU reasonably relied on Ms. DiPietro's statements, that Ms. DiPietro's PFS'es and emails were a "'contributory cause of the extension of credit,'" and SECU proved that it would not have made the Loan if it had received accurate information regarding Ms. DiPietro's financial condition. *In re Coughlin, supra*. The SECU witnesses testified that they followed SECU's standards, policies and protocols regarding the Loan application and the underwriting with respect to the Guaranty. Mr. Weinstein (and Mr. McWilliams) requested from Ms. DiPietro or otherwise obtained all of the documents that were standard for SECU to request for a commercial loan that was not secured by real estate, including, without limitation, a personal financial statement and tax returns. Mr. McWilliams pulled a credit report of Ms. DiPietro and ran a Maryland Case Judiciary Search. He did not

perform a land records search, obtain an appraisal or visit the Landrake Property or Ellison Property because that was not SECU's policy or standard practice for commercial loans that were not backed by a lien on real estate. Further, he did not personally inspect the case files of the cases he found in Case Judiciary Search because that was not within SECU's policy or standard practices.

When he found the Newtek Lawsuit and the AMEX Lawsuit in his judgment and lien search, he had Mr. Weinstein ask Ms. DiPietro for more information on the status of them. Ms. DiPietro provided answers that he found to be credible and documentation, such as the AMEX Stipulation of Dismissal, that seemingly corroborated her representations regarding the status of those cases. It should also be noted that, upon Mr. McWilliams' questions, in the same email in which she represented the Newtek debt to be illegitimate and the AMEX debt to be settled, Ms. DiPietro produced documentation to show that the substantial tax debt, including $202,798.43 of federal tax debt, that Mr. McWilliams had found were taken care of on payment plans. **[P65]** This demonstrated to Mr. McWilliams that she was trustworthy and made his reliance on the other statements in that email all the more reasonable. SECU performed more than a minimal investigation. It took the steps outlined above and followed up with questions to the guarantor.

Regarding any red flags that the data was inaccurate, SECU testified that, to a certain extent, it needed to rely on Ms. DiPietro and the representations she was making. The testimony is undisputed that the Holdings business appeared to be strong, from a credit standpoint, in August 2021, and Ms. DiPietro does not appear to allege that there were any red flags regarding the business. Therefore, a substantial portion of the financial information that SECU was provided by Ms. DiPietro does not appear to be alleged to have been inaccurate.

Mr. McWilliams discovered three red flags regarding Ms. DiPietro: (1) the tax debt; (2) the Newtek Lawsuit; and (3) the AMEX Lawsuit. He did not ignore those issues but, instead, through Mr. Weinstein, he questioned Ms. DiPietro about all three issues. She provided proof that the tax debt was in a payment plan, apparently resolving that issue. As set forth above, she also provided materially false information to seemingly resolve the Newtek and AMEX issues, but she manipulated the information to mislead SECU. (For example, the AMEX Stipulation of Dismissal was a real document filed in that case; it was just outdated and superseded by a subsequent Court Order and the AMEX Judgment that she did not disclose to SECU.)

On the 1st PFS, SECU could not have known that Ms. DiPietro's 2020 tax returns (that would be filed after the Loan was made) would reveal that her total income was grossly inflated. SECU also could not have known that Ms. DiPietro took the position that she should come off the Ellison Property title.

In connection with the 2nd PFS, SECU could not have known about the Sandy Spring Guaranty, which was not a publicly recorded document. And because it followed its standards and policy and did not perform a land records search, it could not have known that Ms. DiPietro granted the HCEDA DOT. Those two obligations combined for $2 million of personal debt.

SECU did not have a previous business relationship with Ms. DiPietro.

SECU's reliance was further reasonable because Ms. DiPietro expressly represented in the PFS'es that they were true and accurate and acknowledged they would be used by SECU as part of the Loan application:

> I hereby certify the above and the statements contained in the attachments are true and accurate as of the date hereof. The statements are made for the purpose of either obtaining a loan or guaranteeing a loan. I understand FALSE statements m[a]y result in forfeiture and possible prosecution by the Attorney General (Ref. 18 U.S.C. 1001).

**[P05, P06]** Likewise, in the Guaranties, Ms. DiPietro made representations and warranties as to the truth and accuracy of the financial information she had provided and would provide, "in all material respects and [that it] fairly present[s] Guarantor's financial condition as of the dates the financial information is provided…." **[P32, SECU001153; P03, SECU000174]** Moreover, the Guaranty for the CTA represented that "no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition." **[P03, SECU000175]**

Under a totality of the circumstances, SECU reasonably relied on Ms. DiPietro's statements. *In re DeJulio, supra.*

## VII. Ms. DiPietro caused to be made or published the statements with the intent to deceive.

Under *In re Koep*:

> The intent to deceive may be inferred by the **totality of the circumstances**, including a debtor's knowing or reckless disregard for the accuracy of financial statements.

334 B.R. at 373 (emphasis added).

Under *In re Coughlin,* which was cited by this Court in *Koep*:

> …actual knowledge of the falsity of the financial information is not required. A creditor can establish intent to deceive by proving reckless indifference to, or reckless disregard of, the accuracy of the information in the financial statement by the debtor. **Courts may assume that debtors intend the natural consequences of their acts.** Intent to deceive is present when the debtor has "**seen the financial statement** and the errors were such that he knew or should have known their falsity."

27 B.R. at 636 (emphasis added); *see In re Bonanza Import & Export, Inc.*, 43 B.R. 570, 576 (Bankr. S.D.Fla. 1984) ("Debtors are presumed to intend the natural consequences of their acts and thus, a debtor who makes a knowing misrepresentation is presumed to have an intent to deceive."); *see also In re Barrett*, 2 B.R. 296, 302 (Bankr. E.D. Pa. 1980) ("The court will not

now shield an intelligent, educated man, who had ample opportunity to read what he signed, from his own carelessness under these circumstances.").

Ms. DiPietro testified that she filled out and signed the PFS'es. Therefore, she had actual knowledge of the contents of the PFS'es when she submitted them to SECU. She also wrote the emails to SECU regarding the Newtek and AMEX matters, so she had actual knowledge of the statements she made therein. She owned and ran HMC and Holdings and had actual knowledge of the financial condition and activities of those entities, including the debts and guaranties. Regarding AMEX, she was present at the May 6, 2021, hearing in which the Circuit Court vacated the AMEX Stipulation of Dismissal and entered the AMEX Judgment against her. She had filed a motion with the Circuit Court in the Newtek Lawsuit one day before she provided the 1st PFS to SECU. She had executed the Sandy Spring Guaranty and the HCEDA DOT before she submitted the 2nd PFS to SECU. She knew of the falsity of the statements she was making in the PFS'es and the emails.

Ms. DiPietro intended the natural consequences of her misstatements. She made all of them for the purpose of obtaining or extending the Loan, something that she acknowledged in writing in the certification contained in the PFS'es. She knew that if she disclosed the true extent of her debts and the accurate picture of her assets that SECU would decline to make the Loan to Holdings (and she was right).

This is not a case where the debtor allegedly made one materially false statement about her financial condition. Rather, this is a case replete with rampant gross inaccuracies in multiple written statements, spanning a one-year period of time. Either Ms. DiPietro actually intended to deceive SECU or had a knowing or reckless disregard for the accuracy of the financial information she provided to SECU. Either way, SECU has proven that she had the intent to deceive.

Based on the record, there can be no likely alternative explanation for her material misstatements to SECU regarding such topics as the AMEX Judgment, the Newtek Judgment, the HCEDA Guaranty, the Sandy Spring Guaranty and the Johnson-Lancaster fraudulent conveyance suit, other than that she intended to keep SECU in the dark about them.

Ms. DiPietro was motivated to mislead SECU about her financial condition, and the timing of her loan application underscores her intent to deceive. Within the four months leading up to her Formstack submission on August 3, 2021, Ms. DiPietro had the AMEX Judgment entered against her; the Newtek Judgment entered against her; and the 2021 Johnson-Lancaster Judgment entered against HMC, which resulted in the Receivership Order and the Contempt Petition filed against her, individually. Holdings tapped the entire $400,000 line of credit in the first year of the Loan and did not pay it back. By the time the Loan came up for maturity in the summer of 2022, Ms. DiPietro had provided the HCEDA Guaranty, HCEDA DOT, as well as the Sandy Spring Guaranty, and Johnson-Lancaster had filed suit against her for fraudulent conveyance. As 2022 dragged on, according to Ms. DiPietro, Holdings was struggling to get paid on two major projects, which ultimately pushed the company into bankruptcy in 2023.

Ms. DiPietro's testimony in this case is not reliable, and she has demonstrated a pattern of dishonesty. The record in the case reflects that, like a chameleon, Ms. DiPietro has manipulated the figures of her assets and liabilities to be larger or smaller, depending on what would benefit the most in a given circumstance. When she was applying for the Loan or the CTA, she valued her assets substantially higher and reported an extremely high annual income, and when she filed for bankruptcy, she valued the substantially lower and drastically reduced her annual income by approximately $500,000. Conversely, in her PFS'es, she substantially underreported her debt and omitted several massive debts, including the Newtek Judgment,

AMEX Judgment, Sandy Spring Guaranty, HCEDA Guaranty and the Johnson-Lancaster fraudulent conveyance suit.

Even in the context on her bankruptcy case and this non-dischargeability suit, she has demonstrated this tendency. In her Petition, she scheduled personal debts for business obligations, such as Billd and Aegis. In the meeting of creditors, she testified that she filed for bankruptcy because she had personally guaranteed "pretty much everything from the buyer agreements to bank financing." However, while testifying in this adversary proceeding, she generally claimed that she could not remember what debts she may have guaranteed.

**Conclusion**

SECU has proven the elements of § 523(a)(2)(B) by a preponderance of the evidence, *In re Koep*, 334 B.R. at 371.

**WHEREFORE,** Plaintiff State Employees Credit Union of Maryland, Incorporated hereby prays this Honorable Court to enter a judgment in its favor and against Defendant/Debtor Kara A. DiPietro finding that its confessed judgment entered by the Circuit Court for Baltimore County, and which is evidenced by its claim filed in Ms. DiPietro's bankruptcy, is non-dischargeable, and providing for such other and further relief as the Court finds is merited by the interests of justice or equity.

Respectfully submitted,

Date: September 8, 2025

Zachary J. A. Coon
Marc E. Shach, Esquire, (Bar No. 06788)
Zachary J. A. Coon, Esquire (Bar No. 29431)
Coon & Cole, LLC
1301 York Road, Suite 400
Lutherville, Maryland 21093
Main: (410) 244-8800
Facsimile: (410) 825-5941
E-mail: mes@cooncolelaw.com
zjac@cooncolelaw.com
*Plaintiff's Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of September 2025, I served a copy of the foregoing **Plaintiff State Employees Credit Union of Maryland, Incorporated's Post-Trial Brief** by CM/ECF, upon:

Joseph Selba, Esquire
Tydings and Rosenberg, LLC
1 East Pratt Street, Suite 901
Baltimore, Maryland 21202
*Counsel to Defendant Kara Anne DiPietro*

/s/ Zachary J. A. Coon
Zachary J. A. Coon