Entered: September 30th, 2026
Signed: September 30th, 2026

**SO ORDERED**

NANCY V. ALQUIST
U. S. BANKRUPTCY JUDGE

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**Baltimore Division**

| | |
|---|---|
| In re:<br><br>KARA ANNE DIPIETRO,<br><br>Debtor. | <br><br>CASE NO. 23-13304-NVA<br><br>CHAPTER 7 |
| STATE EMPLOYEES CREDIT UNION OF MARYLAND, INC.,<br><br>Plaintiff,<br><br>v.<br><br>KARA ANNE DIPIETRO,<br><br>Defendant. | ADVERSARY NO. 23-00208 |

# MEMORANDUM ORDER AWARDING JUDGMENT FOR DEFENDANT

State Employees Credit Union of Maryland, Inc. ("SECU") seeks a determination that a debt owed by Kara DiPietro ("Ms. DiPietro") is not dischargeable in bankruptcy because the debt arises from materially false statements made for the purpose of obtaining an extension of credit. This case stresses a plaintiff's obligations to satisfy its burden of persuasion as to every relevant element of a cause of action. Over the course of a four-day trial, SECU proved that Ms. DiPietro: (1) intentionally inflated her assets and deflated her liabilities when she reported financial

information about herself and a closely held company when she first applied for the loan; (2) omitted critical information SECU requested in considering the loan; (3) provided false and misleading answers to questions with the purpose of obfuscating the true financial condition for herself and her company; and (4) continued to provide false and misleading information when the loan came due with the purpose of obtaining an additional extension of credit. Each of these representations was materially false.

Because of Ms. DiPietro's misrepresentations, SECU extended a line of credit to one of Ms. DiPietro's businesses and, when that line of credit came due, extended the loan by transforming it into a term loan. Ms. DiPietro personally guaranteed both extensions of credit.

Nonetheless, the Court will enter Judgment for Ms. DiPietro. Despite SECU's showing that Ms. DiPietro was dishonest in her representations to SECU, SECU's process of investigating Ms. DiPietro and approving the loan and extension of credit leaves no room for doubt that SECU did not *reasonably rely* on any of Ms. DiPietro's intentionally false statements. Reasonable reliance is a necessary element of SECU's cause of action under section 523(a)(2)(B) of the Bankruptcy Code. Ultimately, Ms. DiPietro's voluminous shortcomings serve to emphasize that SECU knew or should have known that she was reporting unreliable financial information and that SECU could not reasonably rely on that information. Because SECU did not reasonably rely on Ms. DiPietro's false statements, it cannot prove all essential elements of its claim, and the Court must enter judgment for Ms. DiPietro.

## **Jurisdiction**

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334. The United States District Court for the District of Maryland has referred the bankruptcy case and this adversary proceeding to this Court pursuant to 28 U.S.C. § 157(a) and its Local Rule 402. This

proceeding involves claims that are statutorily core under 28 U.S.C. § 157(b)(1) and (b)(2)(I). This Court has constitutional authority to enter final orders in this proceeding. To the extent the Court lacks such constitutional authority, this decision constitutes the Court's report and recommendation.

**Factual Background**

The chronology of events leading up to this adversary proceeding is born out in detail in the trial transcripts and the parties' post-trial submissions. [ECF Nos. 49, 50, 63, 64, 65, 66]. Drawing on that record, the Court summarizes the relevant background here.

*A. Businesses and Business Debts*

Since at least May 2015, Ms. DiPietro was involved in and responsible for obtaining financing for companies she worked for, managed, or owned. She managed HMC, Inc. ("HMC"), first as vice president and later as president and CEO. Ms. DiPietro also founded and operated at least three businesses prior to applying for the loans at issue in this case: Kinetic Capital, LLC, Kinetic Capital Community Foundation, Inc., and Holdings Management Company ("Holdings"). Holdings was a subcontractor for and was closely involved with HMC.

During her tenure with these businesses, Ms. DiPietro was responsible for their financing and financial obligations. For example, in 2018, as president of HMC, Ms. DiPietro was involved in obtaining a $1,000,000 line of credit and $700,000 term loan from Newtek Small Business Finance, LLC ("Newtek"). Ms. DiPietro submitted the applications for both the Newtek loans and was the primary person monitoring payments on those loans.

In October 2019, Ms. DiPietro was involved in obtaining material financing from Billd Exchange, LLC ("Billd") for HMC. Like the Newtek loans, Ms. DiPietro was involved with monitoring payments under the Billd loan.

In November 2019, Ms. DiPietro, in her capacity as Holdings's president and CEO, signed a loan and security agreement and promissory note memorializing a loan for $500,000 that the Howard County Economic Development Authority ("Howard County") made to Holdings.

On April 17, 2020, Johnson-Lancaster and Associates, Inc. ("Johnson-Lancaster") filed a complaint against HMC and Hudson Insurance Company in the United States District Court for the District of Maryland (the "District Court"), case number 1:20-cv-00992. On July 12, 2021, the District Court entered judgment in favor of Johnson-Lancaster and against HMC in the amount $622,960.71 plus interest and costs. That same day, the District Court entered an order appointing a receiver for HMC (the "Receivership Order"). The Receivership Order required, *inter alia*, Ms. DiPietro "to cooperate with the [r]eceiver . . . including by promptly providing the [r]eceiver information and transferring HMC's funds, assets and accounts to the [r]eceiver" and "not oppose, impede, obstruct, hinder, enjoin, delay or otherwise interfere with the [r]eceiver" or his functions under the Receivership Order. On August 2, 2021, Johnson-Lancaster and the appointed receiver filed a contempt petition seeking an order holding HMC and Ms. DiPietro in contempt and imposing sanctions. Holdings filed a motion to intervene on August 4, 2021, which the District Court granted on August 12, 2021, when the District Court also ordered the receiver to cease all activities related to the Distrct Court's case pending further order of the court. On August 24, 2021, the District Court struck the Receivership Order.

On May 5, 2022, Ms. DiPietro, in her capacity as Holding's president, executed two promissory notes evidencing promises to repay $1,500,000 and associated interest and fees to Sandy Spring Bank. The two notes were for $500,000 and $1,000,000, respectively, and contained different repayment terms.

*B. Ms. DiPietro's Personal Finances*

Ms. DiPietro personally guaranteed her companies' debts as part of obtaining the financing discussed above. On October 8, 2019, Ms. DiPietro signed a personal guaranty in which she unconditionally guaranteed HMC's payment of the Billd loan. On November 19, 2021, Ms. DiPietro signed a guaranty agreement in which she unconditionally guaranteed all of Holdings's obligations to Howard County. In late 2021, Ms. DiPietro unconditionally guaranteed Holdings's existing and future obligations to White Cap, L.P.

On July 3, 2018, Ms. DiPietro signed a personal guaranty in which she unconditionally guaranteed the term loan to Newtek (the "Newtek Guaranty"). That same day, she granted an Indemnity Deed of Trust to Newtek by which she granted Newtek a security interest in her real property located at 1836 Landrake Road, Baltimore, Maryland (the "Landrake Property") as collateral for the Newtek term loan.

On June 2, 2021, the Circuit Court for Baltimore County, Maryland (the "State Court") entered a confessed judgment in Newtek's favor and against Ms. DiPietro and HMC in the total amount of $865,747.74 in case number C-03-CV-21-001673 (the "Newtek Judgment"). Ms. DiPietro filed two post-judgment motions which were denied on August 31 and September 22, 2021, respectively.

On October 15, 2018, American Express National Bank ("American Express") filed a complaint against Ms. DiPietro and HMC in the State Court, case number 03-C-18-10293, asserting a single breach of contract cause of action arising out of a business credit card for which Ms. DiPietro and HMC failed to make required payments (the "American Express Lawsuit"). American Express, Ms. DiPietro, and HMC reached a settlement resolving the American Express Lawsuit, evidenced by a Stipulation of Settlement executed by the parties and filed in the American

Express Lawsuit on October 21, 2020 (the "Settlement"). In relevant part, the Settlement memorialized Ms. DiPietro's and HMC's agreement to pay American Express $198,000 in variable monthly payments commencing on November 1, 2020. A stipulation of dismissal without prejudice was filed in the American Express Lawsuit on October 21, 2020. On February 26, 2021, American Express filed a motion to vacate dismissal of the American Express Lawsuit because Ms. DiPietro and HMC failed to make the required payments under the Settlement. After a hearing, the State Court granted American Express's motion to vacate and entered judgment against Ms. DiPietro and HMC, jointly and severally, in the principal amount of $244,449.09 plus court costs of $270.00 (the "American Express Judgment"). Ms. DiPietro filed a motion for new trial in the American Express Lawsuit, which was denied on June 1, 2021; an appeal of the American Express Judgment, which was stricken on June 9, 2021; and a motion to vacate the American Express Judgment, which was denied on July 16, 2021.

On September 27, 2019, Ms. DiPietro and HMC co-signed an installment sales contract with Jaguar Land Rover of Annapolis for the purchase of a 2016 Land Rover sport utility vehicle.

Ms. DiPietro owned two parcels of real property. She acquired the first, the Landrake Property, in July 2016 for $460,000 subject to a mortgage held by PenFed Credit Union with an original principal balance of $414,000. When Ms. DiPietro filed for bankruptcy in March 2023, she scheduled the Landrake Property as being worth $460,000 and subject to PenFed's mortgage of $373,618. At all relevant times, Ms. DiPietro owned the Landrake Property as sole owner in fee simple.

Her second piece of real estate was located at 8405 Ellison Road, Lutherville, Maryland (the "Ellison Property"). Ms. DiPietro purchased the Ellison Property with her ex-husband as joint tenants in June 2019 for $490,000 and subject to a mortgage in the amount of $481,124. In March

2020, Ms. DiPietro and her ex-husband refinanced the Ellison Property establishing a mortgage balance of $481,786 at the time. At all relevant times, Ms. DiPietro remained personally obligated on the Ellison Property mortgage. At times, however, Ms. DiPietro expressed an intent to divest her interest in the Ellison Property. In December 2024, Ms. DiPietro and her ex-husband sold the Ellison Property at a short sale for $515,000.

*C. SECU Line of Credit and Term Loan*

On August 3, 2021—the same day Ms. DiPietro filed a post-judgment motion regarding the Newtek Judgment and more than two weeks after the State Court denied Ms. DiPietro's motion to vacate the American Express Judgment—Ms. DiPietro submitted an online form (the "Loan Inquiry Form") to SECU on behalf of Holdings for the purpose of obtaining a line of credit and term loan from SECU. Irwin Weinstein ("Mr. Weinstein") received the Loan Inquiry Form submitted by Ms. DiPietro. Mr. Weinstein has experience in the banking and lending industry dating back to 2007. At all relevant times, Mr. Weinstein was a business relationship banker for SECU. As part of his responsibilities as a business relationship banker, Mr. Weinstein was involved in commercial lending up to $1,000,000. He did not perform any underwriting of loans for SECU, nor did he have authority to approve loans.

Mr. Weinstein was the only person from SECU who had direct communication with Ms. DiPietro at all relevant times. After receiving the Loan Inquiry Form, Mr. Weinstein contacted Ms. DiPietro by phone and email on August 4, 2021. In a follow-up email to their initial phone call and consistent with SECU's practices, Mr. Weinstein requested from Ms. DiPietro, *inter alia*, (1) 2018, 2019, and 2020 personal and business tax returns; (2) a profit and loss statement for 2021 through year-to-date; (3) a balance sheet; (4) accounts receivable and accounts payable reports; (5) a personal financial statement and business debt schedule; and (6) documents related to

Holdings's corporate status. In this August 4 email, Mr. Weinstein provided a blank personal financial statement and business debt schedule for Ms. DiPietro to complete.

Ms. DiPietro completed and returned her personal financial statement (the "2021 Financial Statement") the same day Mr. Weinstein requested it. In her 2021 Financial Statement, Ms. DiPietro:

a. Reported total assets of $4,891,219, including $1,105,000 worth of real estate and $3,690,495 of "other assets;"

b. Reported total liabilities of $838,250, including $518,000 in mortgages secured by real estate and $250,000 in accrued tax obligations;

c. Reported annual income of $503,284 comprised solely of salary, bonuses, and commissions;

d. Reported no contingent liabilities including "as endorser, co-maker or guarantor," "on leases or contracts," "legal claims," "other special debt," and "contested income tax liens'"; however, to the question "Are you a defendant in any suits or legal actions" located near the contingent liabilities section, Ms. DiPietro wrote in the words "Yes/No;"

e. Reported ownership interests in two pieces of real property—the Landrake Property and the Ellison Property

    1. Ms. DiPietro reported that she was the sole owner of the Landrake Property, having acquired it in July 2017 at the cost of $414,000; that the Landrake Property was worth $615,000 as of the 2021 Financial Statement; and that PenFed Credit Union held the mortgage on the Landrake Property with a balance owed of $319,760 with $2,864 being due every month;

    2. Ms. DiPietro reported that she co-owned the Ellison Property with Rich DiPietro, having acquired it in July 2018 at the cost of $490,000; that the Ellison Property was worth $515,000, and that it was not subject to a mortgage *but* that the mortgage payments on the Ellison Property were $1,500 per month;

f. Left entirely blank a section titled "Schedule D – Debts and Accounts Owed to Others (Itemize Debts Over $1,000. Combine Debts Under $1,000);"

g. Responded "No" to "Are you a partner, owner or officer in any other business or venture;" and

h. Left entirely blank the business debt schedule portion of the financial statement.

The 2021 Financial Statement included the following recitation immediately above Ms. DiPietro's signature:

> I authorize State Employees Credit Union of Maryland, Inc. (SECU) to make inquiries as necessary to verify the accuracy of the statements made and to determine my creditworthiness. Including but not limited to, credit bureau inquiries, verification of my personal and business tax returns with the IRS, credit and banking references, etc. [sic] I hereby certify the above and the statements contained in the attachments are true and accurate as of the date hereof. The statements are made for the purpose of either obtaining a loan or guaranteeing a loan. I understand FALSE statements may result in forfeiture and possible prosecution by the Attorney General (Ref. 18 U.S.C. 1001).

(emphasis in original). The 2021 Financial Statement also included at the top of the first page the statement "I am applying individually for credit, hence, my income and assets (and not the income and assets of another person) shall be the basis for repayment of the credit requested." (emphasis in original). However, it appears that Ms. DiPietro discussed this statement with SECU because, as the parties agree, the 2021 Financial Statement was submitted for the purpose of obtaining a business loan.

In addition to the 2021 Financial Statement, Ms. DiPietro submitted other documents requested by Mr. Weinstein. Except as discussed elsewhere herein, these additional documents were not offered into evidence.

Upon receipt of the 2021 Financial Statement and the other documents from Ms. DiPietro, Mr. Weinstein followed his usual practice which was to first compare the income reported on the personal financial statement with the income reported in the most recent personal income tax return to check for accuracy of information. Mr. Weinstein requested some additional documents from Ms. DiPietro related to Holdings's works-in-progress, accounts receivables, accounts payables, and the effects the Covid pandemic were having on the business. Eventually, Mr. Weinstein sent the documents received from Ms. DiPietro to those responsible for underwriting at SECU.

Edward McWilliams ("Mr. McWilliams") was assigned to underwrite Holdings's loan request. In 2021, Mr. McWilliams was a credit analysist for SECU. His general responsibilities involved reviewing financial statements and borrowers' applications. He would pull relevant credit reports, conduct financial analyses, and prepare memoranda documenting his conclusions. If the application was within his lending authority, he would approve or deny the application. Mr. McWilliams provided underwriting services for Holdings's line of credit in 2021.

In reviewing Holdings's application and Ms. DiPietro's 2021 Financial Statement, Mr. McWilliams discovered the Newtek Judgment, the American Express Judgment, another lawsuit brought by Rich Moe Enterprises, LLC, and an IRS lien. On August 18, 2021, Mr. McWilliams, through Mr. Weinstein, asked for clarification from Ms. DiPietro's attorney or accountant regarding these legal obligations.

Instead of securing clarification from an attorney or accountant—as SECU requested—Ms. DiPietro responded that same day by email (the "Litigation Explanation Email"). The Litigation Explanation Email provided "We were the victims of serious financial crimes; *from which all of that* stemmed, and in retaliation I have been the victim of litigious abuse. I am a registered Department of Justice crime victim and can send you proof of that." (emphasis added). In a supplemental follow-up email, Ms. DiPietro added "Well I know how underwriters are, and being the victim of this type of crime, causes revictimization over and over, as abusive litigation is designed to make the victim look like the perpetrator. If the underwriter won't be able to understand I can't go down this road with SECU."

Along with her written responses, Ms. DiPietro also provided evidence of the February 2021 dismissal of the American Express Lawsuit. SECU's records also indicate that Ms. DiPietro

alleged that Newtek had violated unspecified federal regulations and was ultimately liable to Holdings, but SECU's records also confirm it was not able to verify these allegations.

SECU accepted Ms. DiPietro's written response and did not insist on obtaining an explanation of these legal issues from an attorney or accountant.

SECU's records also reflect an intent to use the IRS tax lien information in evaluating Ms. DiPietro's and Holdings's creditworthiness, but that the tax lien information was not actually used.

In considering judgment debts in its decision making, Mr. McWilliams indicated that it is SECU's standard practice to use either the payment plan amount (if a payment plan exists) or to amortize the entire judgment balance of a period of no more than five years. A review of Mr. McWilliams's analysis shows this was not done: either less than the full amounts of the judgments discussed above were used or they were amortized over a period of more than five years.

According to Rodney Reed ("Mr. Reed"), a commercial credit manager at SECU in 2021 and Mr. McWilliams's supervisor, SECU does not "have an application in the true sense, or as most people are familiar with" the concept—where an application form is completed and submitted for evaluation. Instead, SECU focuses on personal financial statements received in connection with loans and SECU requires any owner owing 20% or more of a company seeking a loan to personally guarantee the loan—which SECU reported is standard practice in the commercial loan industry.

SECU, however, did not consider the value of the Landrake Property and Ellison Property, or the mortgages on the properties, to be material. SECU only considers a guarantor's real estate value and expenses to be material if it is taking the property as collateral. SECU never intended to obtain a security interest in either the Landrake Property or the Ellison Property.

SECU approved the line of credit—both Mr. McWilliams and Mr. Reed approved the loan although either could have approved it individually—for Holdings in 2021 with a $400,000 limit and obtained a personal guaranty from Ms. DiPietro. One of the requirements of the line of credit was that the line of credit "rest"—*i.e.*, maintain a balance of $0.00 for set a period of time before renewal—which did not happen by the time SECU contacted Ms. DiPietro about renewing the line of credit in July 2022. When SECU contacted Ms. DiPietro it requested, *inter alia*, a new personal financial statement and copies of her 2020 tax returns.

Ms. DiPietro provided SECU an updated personal financial statement on August 5, 2022 (the "2022 Financial Statement" and, with the 2021 Financial Statement, the "Financial Statements"). Like the 2021 Financial Statement, the 2022 Financial Statement contained statements concerning Ms. DiPietro's assets and liabilities. In it, Ms. DiPietro:

a. Reported total assets of $5,601,000, including $1,310,000 worth of real estate and $4,200,000 of "business assets;"

b. Reported liabilities of $735,000, including $365,000 in mortgages secured by the Landrake Property and an estimated $155,000 2021 tax liability;

c. Reported annual income of $665,618 comprising of $168,000 in salary, bonuses, and commissions, and $497,618 of other income "(s-corp);"

d. Reported no contingent liabilities including "as endorser, co-maker or guarantor," "on leases or contracts," "legal claims," "other special debt," and "contested income tax liens'"; however, to the question "Are you a defendant in any suits or legal actions" located near the contingent liabilities section, Ms. DiPietro wrote in "No;"

e. Reported ownership interests in two pieces of real property—the Landrake Property and the Ellison Property

    1. Ms. DiPietro reported that she was the sole owner of the Landrake Property, having acquired it in July 2017 at the cost of $414,000; that the Landrake Property was worth $725,000 as of the 2022 Financial Statement; and that PenFed Credit Union held the mortgage on the Landrake Property with a balance owed of $365,000 with $2,600 being due every month;

2. Ms. DiPietro reported that she co-owned the Ellison Property with Rich DiPietro, having acquired it in July 2019 at the cost of $500,000; that the Ellison Property was worth $585,000 and not subject to a mortgage;

f. Left entirely blank a section titled "Schedule D – Debts and Accounts Owed to Others (Itemize Debts Over $1,000. Combine Debts Under $1,000);"

g. Responded "No" to "Are you a partner, owner or officer in any other business or venture;" and

h. Failed to include the business debt schedule portion of the financial statement.

Like the 2021 Financial Statement, the 2022 Financial Statement also included the following recitation immediately above Ms. DiPietro's signature:

> I authorize State Employees Credit Union of Maryland, Inc. (SECU) to make inquiries as necessary to verify the accuracy of the statements made and to determine my creditworthiness. Including but not limited to, credit bureau inquiries, verification of my personal and business tax returns with the IRS, credit and banking references, etc. [sic] I hereby certify the above and the statements contained in the attachments are true and accurate as of the date hereof. The statements are made for the purpose of either obtaining a loan or guaranteeing a loan. I understand FALSE statements may result in forfeiture and possible prosecution by the Attorney General (Ref. 18 U.S.C. 1001).

(emphasis in original). Ms. DiPietro also submitted copies of her 2020 tax returns—prepared after the line of credit was approved in 2021. Ms. DiPietro's 2020 tax returns show wages and salaries of $173,351 and total business income (not factoring in losses) of $125,282.

In evaluating the loan for renewal, SECU's underwriter expressed concern that the line of credit had not rested. In response to an email Mr. Weinstein sent relaying the underwriter's concern, Ms. DiPietro asked whether the loan could be converted to a "hybrid" line of credit/term loan.

SECU decided not to renew the line of credit but did approve "terming out" the line of credit by extending a term loan for the line's repayment.

*D. Loan Default and Bankruptcy*

Both Holdings and Ms. DiPietro suffered mounting financial difficulties. Both defaulted on their obligations to SECU and, on February 2, 2023, SECU obtained a confessed judgment for $404,098.96 plus interest against Ms. DiPietro and Holdings jointly and severally.

Ms. DiPietro filed for relief under chapter 11 of the Bankruptcy Code on May 11, 2023. SECU filed a claim in Ms. DiPietro's bankruptcy case asserting a general unsecured claim for $417,800.04. The Court entered an order granting SECU additional time to file a complaint to object to the dischargeability of its claim against Ms. DiPietro and SECU timely filed its Complaint in this action. Ms. DiPietro's bankruptcy case was converted to chapter 7 on March 21, 2024, and on July 16, 2024, she obtained a chapter 7 discharge. Whether her debt to SECU was discharged is the subject of this adversary proceeding.

## Legal Standards

Typically, an individual chapter 7 discharge "discharges the debtor from all debts that arose before the date of the order for relief"—usually the petition date. 11 U.S.C. § 727(b). However, a chapter 7 discharge does not discharge debts arising from false statements a debtor makes concerning her financial condition. 11 U.S.C. § 523(a)(2)(B).

A creditor objecting to the dischargeability of its debt must prove each element of its claims by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 287 (1991). Where, as here, the creditor seeks a nondischargeability determination pursuant to section 523(a)(2)(B), the objecting creditor must prove that its debt was obtained by the use of a statement

(1) in writing; 11 U.S.C. § 523(a)(2)(B)

(2) that is materially false; 11 U.S.C. § 523(a)(2)(B)(i)

(3) respecting the debtor's or an insider's financial condition; 11 U.S.C. § 523(a)(2)(B)(ii)

(4) on which the creditor to whom the debtor is liable for money, property, services, or credit reasonably relied; 11 U.S.C. § 523(a)(2)(B)(iii) and

(5) that the debtor caused to be made or published with the intent to deceive 11 U.S.C. § 523 (a)(2)(B)(iv).

*Guaranty Residential Lending, Inc. v. Koep (In re Koep)*, 334 B.R. 364, 372–73 (Bankr. D. Md. 2005) (citing *Insurance Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1114 (3d Cir. 1995)).

First, for a debt to be nondischargeable under section 523(a)(2)(B), the relevant statement must be in writing. To be "in writing," the statement must have been either written by the debtor, signed by the debtor, or written by someone else but adopted and used by the debtor. *See Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 90–91 (6th Cir. 1993); 4 Collier on Bankruptcy ¶ 523.08[2][a] (16th ed. 2026).

As for the second element—that the written statement be materially false—this Court has previously explained that

> a written statement is materially false if it paints a substantially untruthful picture of the defendant's financial condition by misrepresenting information of the type that would normally affect a plaintiff's decision to grant credit. Mere inaccuracy is not sufficient, rather, material falsity requires a significant understatement of liabilities or exaggeration of assets.

*In re Koep*, 334 B.R. at 373 (citing *Global Express Money Orders, Inc. v. Davis (In re Davis)*, 262 B.R. 673, 680 (Bankr. E.D.Va. 2001)). The actual reliance by the creditor on the false representation is *an* indicium of materiality; however, a false statement can be material even if the creditor did not actually rely on it. *In re Cohn*, 54 F.3d at 1114. One of the guideposts of materiality is whether the creditor would have made the loan had it known the debtor's true financial condition. *Id.* (citing *In re Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985)).

As relevant here, the third element requires that the statement be respecting the financial condition of the debtor. 11 U.S.C. § 523(a)(2)(B)(ii). It does not require any particular format. The Fourth Circuit has long held a statement "respecting" a debtor's financial condition is *any statement* that has bearing on the debtor's financial status, not just a statement regarding the debtor's overall financial status. *Engler v. Van Steinburg (In re Van Steinburg)*, 744 F.2d 1060, 1062 (4th Cir. 1984) ("A debtor's assertion that he owns certain property free and clear of other liens is a statement respecting his financial condition. . . ."). The Supreme Court has adopted this application of section 523(a)(2)(B)(ii), rejecting the interpretation that a statement "respecting" a debtor's financial condition refers only to statements encompassing the debtor's overall financial status—the statement must simply have "*a direct relation to or impact on the debtor's overall financial status.*" *Lamar, Archer & Cofrin v. Appling*, 584 U.S. 709, 720 (2018) (emphasis added). "A single asset has a direct relation to and impact on aggregate financial condition, so a statement about a single asset bears on a debtor's overall financial condition and can help indicate whether a debtor is solvent or insolvent, able to repay a given debt or not." *Id.*

The fifth element requires that the debtor published the statement with the intent to deceive. 11 U.S.C. § 523(a)(2)(B)(iv). The publication requirement does not necessitate that the statement be made directly to the creditor so long as the creditor learns of the false statement and relies on it. 4 Collier on Bankruptcy ¶ 523.08[2][e][ii]. Intent requires more thought. The objecting creditor must demonstrate that the debtor's alleged false statement was either knowingly false or made so recklessly as to warrant a finding that the debtor acted fraudulently. *In re Cohn*, 54 F.3d at 1119. Courts consider the totality of the circumstances to determine whether the debtor submitted a financial statement with an intent to deceive. *Id.* Reckless disregard for the truth or falsity of a statement combined with the magnitude of the resulting misrepresentation may support an

inference of an intent to deceive. *Morrison v. Western Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473, 482 (5th Cir. 2009). However, where a creditor misleads a debtor into signing a materially false statement—for example, when the creditor's agent fills out the statement and provides it for the debtor to sign—the intention element is lacking. *See International Harvester Co. v. Carlson*, 217 F. 736, 740 (8th Cir. 1914) ("But if [the debtor] is misled into signing an untrue statement by the creditor's own agent, in whom he had a right to rely, the statement is not 'false' within the meaning of the statute.").

This case, as explained below, turns on the fourth element—whether SECU reasonably relied on a false statement made by Ms. DiPietro. *See* 11 U.S.C. § 523(a)(2)(B)(iii).

> The reasonable reliance requirement is often satisfied by evidence that the credit would not have been extended if accurate financial information had been disclosed. However, the court must consider all surrounding circumstances, including whether information available to the creditor indicates that further inquiry should be made. The creditor failing to pursue warning signs risks the court's finding a lack of reasonable reliance.

*In re Davis*, 262 B.R. at 680 (citing *In re Coughlin*, 27 B.R. 632, 637 (B.A.P. 1st Cir. 1983); *Sinclair Oil Corp. v. Jones (In re Jones)*, 31 F.3d 659, 662 (8th Cir. 1994)). Like a debtor's intentions, the reasonableness of a creditor's reliance is judged in light of the totality of the circumstances, taking into account factors including whether: (i) there had been previous dealings between the debtor and creditor; (ii) there were any warning signs that would have alerted a reasonably prudent person to the debtor's misrepresentations; (iii) minimal investigation would have uncovered the inaccuracies in the debtor's financial statement; and (iv) the creditor's standard practices in evaluating creditworthiness and the standards or customs of the creditor's industry in evaluating creditworthiness. *In re Cohn*, 54 F.3d at 1117; *In re Jones*, 31 F.3d at 662; *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir. 1993); *Smith v. Cunningham (In re*

*Cunningham)*, 163 B.R. 657, 661 (Bankr. D. Mass. 1994); *Shawmut Bank v. Goodrich (In re Goodrich)*, 999 F.2d 22, 24–25 (1st Cir. 1993).

## Analysis

Congress tells us that a creditor's debt may be excepted from discharge only under specific circumstances. Here, SECU argues that its debt is excepted from discharge because it arises from loans it made to Holdings, guaranteed by Ms. DiPietro, only because Ms. DiPietro intentionally made false statements respecting her financial condition to obtain the loans. To prevail, SECU must prove all five aforesaid elements by a preponderance of the evidence. Section 523(a)(2)(B) recognizes that both the 2021 line of credit and the 2022 term loan are subject to separate nondischargeability determinations. *See* 4 Collier on Bankruptcy ¶ 523.08[2][f] ("[W]hen a debt is refinanced, a court must examine both the amount initially advanced and the additional funds obtained by the debtor."). Where possible, the Court considers the two loans concurrently. Where appropriate, the Court highlights its differentiated analysis. As explained below, SECU fails to meet its burden; while SECU successfully proved four of the five elements, it did not reasonably rely on Ms. DiPietro's statements.

### *A. Writing, materially false, and respecting financial condition*

SECU established the first three elements of section 523(a)(2)(B)—Ms. DiPietro issued a writing, that is materially false, respecting her financial condition. Both the 2021 Financial Statement and the 2022 Financial Statement Ms. DiPietro submitted to SECU are clearly writings, as were her emails to SECU, including the Litigation Explanation Email. The 2021 Financial Statement and the 2022 Financial Statement contain assertions regarding Ms. DiPietro's assets and liabilities in substantial detail—both understating (and omitting) liabilities and exaggerating assets. The Litigation Explanation Email contains an explanation of Ms. DiPietro's and Holdings's

litigation exposure and liabilities. All these writings have a direct relation or impact on Ms. DiPietro's or Holdings's overall financial status.

These statements contain materially false information, including but not limited to:

a. Ms. DiPietro's inflation of annual income in both Financial Statements;

b. Her failure to disclose contingent liabilities including her guarantor liability in both Financial Statements;

c. Her failure to disclose her judgment liabilities in both Financial Statements;

d. Her misleading claim about being the victim pertaining to *one* case in response to a request for information regarding *many* cases;

e. Her failure to disclose tax liabilities in both Financial Statements;

f. Her failure to disclose her ownership in other businesses in both Financial Statements;

g. Her failure to disclose the mortgage on the Ellison Property in the 2022 Financial Statement;

h. Her exaggeration of value of both the Landrake Property and Ellison Property in both Financial Statements; and

i. Her failure to schedule all debts over $1,000 on Schedule D in both Financial Statements.

These averments are materially false because they are more—indeed, much more—than mere inaccuracies. They paint a substantially untruthful picture of Ms. DiPietro's financial condition. They inflate her assets and income and minimize her and Holdings's liabilities—the kind of information that normally affects a lender's decision to grant credit.

*B. Intent to Deceive*

The Court next skips to the fifth element—whether Ms. DiPietro caused to be made or published a written statement with the intent to deceive SECU. This is a closer call, but the Court finds SECU carried its burden on this element, too. SECU established that the statements were sent to SECU, and that the statements were knowingly false or made so recklessly as to warrant a finding that Ms. DiPietro acted fraudulently.

Based on the evidence presented, the Court finds that the Financial Statements and Litigation Explanation Email were knowingly false. It is true that some, but not all, false information supplied *might* be explained away as innocent mistakes. For example, Ms. DiPietro failed to list the outstanding mortgage obligation for the Ellison Property on the 2021 Financial Statement, but she did list a monthly mortgage payment suggesting the existence of that mortgage. Ms. DiPietro credibly testified as to why she believed this approach was correct: she was paying $1,500 per month to her ex-husband so *he* could pay the mortgage.

Other false information cannot be so easily explained away, however. For instance, Ms. DiPietro did not disclose the Johnson-Lancaster litigation to SECU. Ms. DiPietro was obviously aware of this litigation when she submitted the Loan Inquiry Form and the 2021 Financial Statement—she was actively participating in the litigation at that time. Ms. DiPietro *might* have thought she was not required to disclose this litigation on the belief that the District Court would soon strike the receivership order and decline to hold her in contempt—both did happen—but she knew about the litigation and it was not for her to decide whether the litigation would be material to SECU's lending decisions.

And some false information is simply unexplainable. Ms. DiPietro clearly knew of the judgments against her—she sent the Litigation Explanation Email within hours of being asked for clarification—but she failed to list any judgment liability on the Financial Statements. Likewise, she failed to disclose *any* of her personal guaranty liability on the Financial Statements. The 2022 Financial Statement was more misleading than the 2021 Financial Statement: Ms. DiPietro outright denied being a defendant in any litigation and did not so much as suggest the existence of the Ellison Property mortgage in 2022.

These evasions, manipulations, and omissions support the conclusion that Ms. DiPietro intended to deceive SECU. Further, after receiving the Litigation Explanation Email, SECU contacted Ms. DiPietro for explanation regarding the multiple lawsuits it discovered—Newtek, American Express, and Rich Moe—and the tax liens. Ms. DiPietro's response was misleading. She indicated that "all this" litigation stems from her being the victim of a crime. Ms. DiPietro has since stated that the crimes alluded to in the Litigation Explanation Email pertain only to the Rich Moe litigation. Also, Ms. DiPietro submitted evidence to SECU that the American Express Lawsuit was dismissed. But, Ms. DiPietro *knew* the State Court vacated dismissal and entered judgment against her because she filed post-judgment motions that the State Court had already denied when she submitted the Loan Inquiry Form. Only one conclusion remains: Ms. DiPietro submitted the Financial Statements and the Litigation Explanation Email with the intent to deceive SECU.

*C. No Reasonable Reliance*

SECU's case fails on the fourth element, reasonable reliance, because the evidence did not show that SECU's reliance on the plethora of Ms. DiPietro's materially false statements was reasonable.

Like intent to deceive, reasonable reliance—or its absence—is established by the totality of the circumstances. *See Coston*, 991 F.2d at 261 ("The bankruptcy court may consider, among other things: whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any 'red flags' that would have alerted an ordinarily prudent lender to the possibility that the representations relied on were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representation"). There was no relationship between SECU and Holdings or Ms. DiPietro prior to the 2021

financing. The 2021 Financial Statement contains many red flags that should have caused SECU to question Ms. DiPietro's veracity, and her and Holdings's creditworthiness, including

a. The listing of $3,690,495 in "Other Assets" without any providing explanation for this figure;

b. The listing of annual income from "Salary, Bonuses, Commissions" of $503,284 whereas Ms. DiPietro's 2019 federal tax return—the most recent provided to SECU at the time—showed income of only $168,819;

c. The space for disclosing contingent liabilities was left blank *except* for the ambiguous "Yes/No" response to "[a]re you a defendant in any suits or legal actions"; and

d. The failure to identify legal claims or debts and accounts owed to others, whereas SECU's own review brought to light the Newtek Judgment, American Express Judgment, and outstanding tax liabilities.

SECU's own underwriting systems discovered more red flags. After receiving the file from Mr. Weinstein, Mr. McWilliams expressed concerns about recent price increases for Holdings's raw materials but did not pursue this point. As stated, Mr. McWilliams also uncovered Ms. DiPietro's undisclosed legal troubles—including the Newtek Judgment, the American Express Judgment, the Rich Moe litigation, and the IRS tax liabilities. Although Mr. Weinstein confronted Ms. DiPietro about the litigation matters and specifically requested an explanation from an attorney or accountant—someone with subject matter expertise—he did not follow through on this request. Instead, he allowed Ms. DiPietro alone to provide an explanation in her Litigation Explanation Email. Furthermore, the Litigation Explanation Email raised a warning of its own—Ms. DiPietro was considering walking away from SECU if its underwriters continued to press her on its inquiries.

Ms. DiPietro did provide evidence of the February 2021 dismissal of the American Express Lawsuit. It is not clear which document Ms. DiPietro submitted to SECU to quell its concern—the stipulation of settlement or the stipulation of dismissal. But it makes no difference because

both documents put SECU on notice that Ms. DiPietro still had liability to American Express.[1] And the American Express Judgment was entered more than two months after the stipulated dismissal. SECU was clearly on notice that the American Express Judgment was a valid judgment against Ms. DiPietro but failed to factor that consequential ($244,719.09) judgment into its evaluation of Ms. DiPietro's or Holdings's creditworthiness.

Equally inexplicable is SECU's acceptance of Ms. DiPietro's explanation regarding the Newtek Judgment: that she had possible counterclaims because Newtek "violated Federal Regulatory code, provided [her] with a fraudulent loan, and defrauded the United States." Mr. McWilliams knew SECU could not be sure Ms. DiPietro would be successful in her challenge. SECU discovered the Newtek Judgment ($865,747.74), but there was no way Mr. McWilliams could have independently evaluated Ms. DiPietro's supposed counterclaims. Yet, Mr. McWilliam's analysis seems to have discounted the amount of the Newtek Judgment.[2]

At trial, SECU focused on Ms. DiPietro's inflated property values and mischaracterization of the Ellison Property mortgage. According to Mr. Reed, however, "[t]he real estate is only material if [SECU was] taking it as collateral" and that it was "just stated information." He specifically acknowledged it was immaterial to SECU's lending decision.[3] A creditor that takes a statement as "just [] information" necessarily cannot be relying on that information. So all of SECU's focus at trial on real property issues was a red herring.

---

[1] The stipulation of settlement specifically set forth the payment terms, and the stipulation of dismissal spells out that the "parties further stipulate to the right of either party to move to vacate the dismissal and reopen this case to enforce the terms of the Stipulation of Settlement."

[2] Mr. McWilliams's Credit Memo, for example, notes that Holdings "was sued by Newtek[] under Confessed Judgment for the amount of $112,700" in one place, but seemingly did not include the Newtek Judgment in any debt service coverage ratio he calculated.

[3] As pointed out *supra*, a statement may be immaterial to a lender's decision to make a loan and still be "materially false" for purposes of section 523(a)(2)(B).

SECU's behavior must be considered in light of practices standard and customary in SECU's industry. Mr. Reed testified that it is standard industry practice to obtain a personal guaranty from any individual owning more than 20% of the borrower entity. Ms. DiPietro owned more than 20% of Holdings, so, as Mr. McWilliams and Mr. Reed testified, they evaluated Ms. DiPietro's personal debt service coverage ratio in connection with taking her guaranty. However, if Ms. DiPietro had accurately reported her debts, her debt service coverage ratio would have been so low that SECU would have denied the loan, as Mr. McWilliams stated. Ms. DiPietro's judgment debts factor into her debt service coverage ratio. The Newtek Judgment and American Express judgments would have altered the ratio substantially—and SECU knew about them. But SECU did not factor them into Ms. DiPietro's ratio, and that was not reasonable. Accordingly, any reliance on the ratio would be unreasonable. SECU also considered Holdings's own debt service coverage ratio and a combined ratio for Ms. DiPietro and Holdings, but SECU reliance on these ratios was unreasonable for the same reasons.[4]

When SECU reached out to Ms. DiPietro in July 2022 to discuss renewal of the line of credit, it requested, *inter alia*, another personal financial statement and 2020 tax returns. Ms. DiPietro provided both.

SECU repeated its unreasonable reliance in 2022. All the same omissions and misrepresentations from 2021 were reiterated by Ms. DiPietro in 2022. After discovering the

[4] It appears SECU *may* have considered the American Express Judgment in Holdings' debt service coverage ratio, but, if it did, it amortized that debt in a manner contrary to its own policy. Accordingly, the possible inclusion of this debt cannot rescue SECU. Moreover, SECU's reliance on the debt service coverage ratios is questionable at best. Mr. Reed's testimony was clear that SECU did not rely on Ms. DiPietro's mortgage liabilities in deciding to extend credit. Yet her mortgage liabilities were relevant to calculating the debt service coverage ratios. If SECU was not concerned about the accuracy of the mortgage liability reported, it naturally follows that SECU was not concerned about ratios calculated with that information.

judgments and tax liens through its own investigation, SECU again failed to consider them for the 2022 term financing.

In 2022, Ms. DiPietro submitted her 2020 tax returns to SECU for the first time. Her 2020 tax returns are at odds with the income reported on both the Financial Statements. The 2020 tax returns show salary income of $173,351 and total business income (not factoring in losses) of $125,282. However, the 2021 Financial Statement claimed income of $503,284 and the 2022 Financial Statement claimed income of $666,618. The significantly inflated income figures should have reasonably raised concern at SECU, but there was no evidence SECU cared. Finally, in extending the 2022 term loan, SECU ignored its own requirement that the loan "rest," and thus declined to follow its own standard practice. *See In re Cohn*, 54 F.3d at 1117 (noting that the lender's standard practices are relevant but emphasizing the lender's obligations to heed red flags).

**Conclusion**

SECU asks this Court to determine that its debt is excepted from Ms. DiPietro's discharge. To prevail, SECU needed to prove that its debt was obtained by the use of a statement by Ms. DiPietro (i) in writing; (ii) that is materially false; (iii) respecting her financial condition; (iv) on which SECU reasonably relied; and (v) made or published with the intent to deceive. After four days of trial, SECU established by a preponderance of the evidence that Ms. DiPietro made written statements respecting her financial condition that were materially false and made with the intent to deceive SECU. But the evidence also established that SECU did not reasonably rely on Ms. DiPietro's statements. Accordingly, SECU has not carried its burden and its debt is not excepted from discharge. Therefore, it is, by the United States Bankruptcy Court for the District of Maryland, hereby

ORDERED, that Judgment is entered for Defendant; and it is further

ORDERED, that SECU's Claim is not excepted from discharge pursuant to section 523(a)(2)(B) of the Bankruptcy Code.

cc: Counsel for State Employees Credit Union of Maryland, Inc. – Marc Shach
Counsel for State Employees Credit Union of Maryland, Inc. – Zachary Coon
Counsel for Kara Anne DiPietro – Joseph Selba
Chapter 7 Trustee – Monique Almy
United States Trustee

**END OF MEMORANDUM ORDER**